UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVEN EHRLICH,

           Plaintiff,

    v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, et al.,

         Defendants.

Case No. 20-cv-02284-JST

**ORDER ON CROSS-MOTIONS FOR
JUDGMENT**

Re: ECF Nos. 63, 73, 74, 75, 77

Before the Court are cross-motions for summary judgment brought by Plaintiff Steven
Ehrlich, *see* ECF Nos. 63, 74, and Defendants Hartford Life and Accident Insurance Company
("Hartford"), Aetna Life Insurance Company ("Aetna"), and TriNet Group, Inc. ("TriNet")
(collectively, "Defendants"), ECF No. 75.  For the reasons set forth below, the Court will grant
judgment for Plaintiff on his claim for long-term disability benefits, and grant judgment for
Defendants on Plaintiff's claim for penalties.[1]

## I.    PROCEDURAL BACKGROUND

This action arises out of the termination of Plaintiff's long-term disability benefits ("LTD
benefits") under the TriNet Group Inc. Group Policy Employee Benefit Plan (hereinafter, the
"Group Policy"), which is covered by the Employment Retirement Income Security Act
("ERISA").  ECF No. 1.  The initial complaint asserted three claims: (1) a claim under ERISA
Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to recover benefits under the Group Policy; (2) a
claim for equitable relief under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3); and (3) a claim
for penalties under ERISA Section 502(c), 29 U.S.C. § 1132(c).  *Id.* ¶¶ 27-41.

---

[1] As discussed below, the Court construes the cross-motions for summary judgment with respect
to Plaintiff's claim for benefits as motions for judgment under Rule 52.

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendant Aetna funded the Group Policy and both Defendant Aetna and Defendant Hartford administered Plaintiff's claim for LTD benefits under the Group Policy.  *See* ECF No. 17 at 1-2.  Aetna Defendants[2] filed an answer on July 2, 2020.  ECF No. 17.  Defendant TriNet sponsored the Group Policy and filed an answer on August 18, 2020.  ECF No. 22.

On May 7, 2021, the Court granted, with leave to amend, Defendants' motion for partial judgment on the pleadings as to Plaintiff's claim for equitable relief under ERISA Section 502(a)(3).  ECF No. 52 at 15.  On the same date, the Court held that the applicable standard for judicial review with respect to Plaintiff's claim for benefits is abuse of discretion.  *See id.*

On May 28, 2021, Plaintiff filed an amended complaint in which he attempted to allege new facts in support of his claim for equitable relief.  ECF No. 53.  On July 15, 2021, the Court granted Defendants' motion to dismiss Plaintiff's claim for equitable relief, this time with prejudice.  ECF No. 60.  Accordingly, the only two claims that remain at issue are (1) Plaintiff's claim for benefits under Section 502(a)(1)(B), which is asserted against all Defendants; and (2) his claim for penalties under Section 502(c), which is asserted against Aetna Defendants as plan administrators.

On July 19, 2021, the Court denied Plaintiff's motion for reconsideration as to the standard of judicial review that applies to his claim for benefits.  ECF No. 61.  Thereafter, the parties filed cross-motions for summary judgment with respect to Plaintiff's claim for benefits.  *See* ECF Nos. 63, 64.  In their cross-motion, Defendants also moved for summary judgment with respect to Plaintiff's claim for penalties.  *See* ECF No. 64.  In his opposition to Defendants' cross-motion for summary judgment, Plaintiff requested leave to conduct additional discovery pertaining to Aetna Defendants' structural conflict of interest in the form of Rule 30(b)(6) depositions of Aetna Defendants.  *See* ECF No. 65 at 21; *see also* ECF No. 63 at 30.  Defendants did not dispute that Aetna Defendants operate under a structural conflict of interest but opposed the request for discovery.  ECF No. 64 at 27.

---

[2] Defendants request that the Court refer to Defendant Hartford and Defendant Aetna collectively as "Aetna" because Hartford acquired Aetna's group benefits business in 2017.  *See* ECF No. 64 at 6 n.1.  The Court will refer to Defendants Aetna and Hartford as "Aetna Defendants."

On August 23, 2022, the Court denied the cross-motions for summary judgment without prejudice and granted Plaintiff's request to conduct the Rule 30(b)(6) depositions he requested, finding that the discovery would bear on the question of how much weight the Court should accord to Aetna Defendants' structural conflict of interest when reviewing Defendants' termination of Plaintiff's LTD benefits for an abuse of discretion.  ECF No. 68 at 8-14.  The Court instructed the parties that, after the depositions were conducted, they could renew their cross-motions for summary judgment.  *See id.* at 14.

Defendants filed a renewed motion for summary judgment with respect to Plaintiff's claim for benefits and claim for penalties.  *See* ECF No. 75.  Plaintiff, on the other hand, filed a supplemental brief in which he purported to incorporate by reference the briefs he previously filed in support of the motion for summary judgment that the Court previously denied without prejudice.  *See* ECF No. 74 at 5.  Defendants filed a reply in support of their renewed motion for summary judgment, ECF No. 76, and Plaintiff filed a second supplemental brief, ECF No. 77. The Court will treat Plaintiffs' supplemental briefs, ECF Nos. 74, 77, collectively, as a renewed motion for summary judgment and will consider the briefs that Plaintiff previously filed in support of the motion for summary judgment that the Court denied without prejudice, namely ECF Nos. 63 at 65, as part of Plaintiff's renewed motion.

Because the Court will review Plaintiff's claim for benefits for an abuse of discretion, the Court will treat the parties' renewed cross-motions for summary judgment with respect that claim as cross-motions for judgment under Federal Rule of Civil Procedure 52.[3]  *See Burke v. Pitney Bowes Inc. Long Term Disability Plan*, 640 F. Supp. 2d 1160, 1170 (N.D. Cal. 2009), *aff'd sub nom. Burke v. Pitney Bowes Inc.*, 392 F. App'x 570 (9th Cir. 2010) (holding that cross-motions for summary judgment "may be decided pursuant to Rule 52 even where one or both parties has styled its motion as a motion for summary judgment" because "a court reviewing for an abuse of discretion must review the administrative record and make something 'akin to a credibility

---

[3] That is consistent with the parties' agreement for how Plaintiff's claim for benefits should be resolved.  *See* ECF No. 24 a 3 (joint case management stating: "The parties agree that dispositive motions, under FRCP 52, are the appropriate vehicle to adjudicate Plaintiff's claim for benefits.").

United States District Court
Northern District of California

1  determination' about the plan administrator's decision to deny benefits") (quoting *Abatie v. Alta*

2  *Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006)).

3     The Court will resolve Defendants' motion for summary judgment with respect to

4  Plaintiff's claim for penalties, which is not opposed, under Federal Rule of Civil Procedure 56.

5  **II.     FINDINGS OF FACT[4]**

6      **A.     Relevant Terms of the Group Policy**

7     Plaintiff was enrolled in the Group Policy when he applied for disability benefits in

8  October 2016.  AR3182-98; AR2832.[5]

9     The Group Policy provides for long-term disability benefits.  Eligibility for such benefits

10  depends on whether a claimant meets all of the following three requirements: (1) the claimant is

11  disabled by an illness, injury, or disabling pregnancy-related condition under the "Test of

12  Disability"; (2) the claimant is "covered by the plan" at the time he or she becomes disabled; and

13  (3) the claimant is under the "regular care of a physician" for "the illness, injury, or pregnancy

14  related condition that caused the disability."  AR3182.  The Group Policy defines "illness" as a

15  "pathological condition of the body that presents a group of clinical signs and symptoms and

16  laboratory findings peculiar to the findings [that] set the condition apart as an abnormal entity

17  differing from other normal or pathological body states."  AR3201.

18     The "Test of Disability" provides:

19          From the date that you first became disabled and until monthly
20          benefits are payable for 24 months you meet the test of disability
              on any day that:

21

22

23  _____

24  [4] Rule 52 provides that, "[i]n an action tried on the facts without a jury or with an advisory jury,
    the court must find the facts specially and state its conclusions of law separately."  This order
25  makes factual findings and states conclusions of law pursuant to Federal Rule of Civil Procedure
    52.  "To the extent that any conclusions of law are inadvertently labeled as findings of fact (or vice
26  versa), the findings and conclusions shall be considered in [their] true light, regardless of the label
    that the . . . court may have placed on [them]."  *Rodriguez v. Barrita, Inc.*, 62 F. Supp. 3d 936, 938
27  n.1 (N.D. Cal. 2014) (alterations in original, citation omitted).

28  [5] AR refers to the administrative record, which was filed as ECF No. 32-3 (AR0001-AR1069),
    ECF No. 32-4 (AR1070-AR2140), and ECF No. 32-5 (AR2141-AR3209).

United States District Court
Northern District of California

- You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition [. . . .]

- Your earnings are 80% or less of your adjusted predisability earnings.

After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition.

*See* AR3183.  The Group Policy defines "reasonable occupation" as "any gainful activity" for which the claimant is or may reasonably become, fitted by education, training or experience; and which results in, or can be expected to result in, an income of more than 80% of his adjusted predisability earnings.  AR3203.

For the purpose of long-term disability coverage, "regular care of a physician" means that the claimant is "attended by a physician" who has the medical training and clinical expertise suitable to treat the claimant's "disabling condition."  AR3202.  If the claimant's "disability is caused, to any extent, by a mental health or psychiatric condition[,]" then the physician must be one who "specializes in psychiatry" and whose treatment is "[c]onsistent with the diagnosis of the disabling condition."  AR3202 (hereinafter, "regular care of a physician provision").

The Group Policy provides that eligibility for long-term disability benefits ends when the first of multiple enumerated circumstances occurs.  AR3184.  Those circumstances include: (1) "[t]he date you are no longer under the regular care of a physician"; (2) "[t]he date you fail to provide proof that you meet the LTD test of disability"; and (3) "[t]he date you no longer meet the LTD test of disability, as determined by Aetna."  AR3184.  The Group Policy requires a claimant to "give proof of the nature and extent of the loss" and to "furnish true and correct information as Aetna may reasonably request."  AR3198.  The Group Policy permits Aetna Defendants to have a "physician of [their] choice examine any person who is requesting certification or benefits for new or ongoing claims."  AR3196.

Eligibility for long-term disability coverage ends "after benefits have been payable for 24 months if it is determined that [the] disability is *primarily caused by* . . . [a] mental health or psychiatric condition, including physical manifestations of these conditions" (hereinafter, the "24-

month mental health limitation").  AR3185 (emphasis added).

The Group Policy permits a claimant to file an appeal of an adverse benefit determination, which is a denial, termination of, or failure to provide or make payment for a benefit.  *See* AR3208-09.  An appeal is a "written request to Aetna to reconsider an adverse benefit determination."  AR3208.  An appeal must be filed within 180 days of an adverse benefit determination.  AR3209.

**B.    Overview of Plaintiff's Claim for LTD Benefits**

Plaintiff was a senior vice president of marketing and product management when he applied for disability benefits under the Group Policy based on a variety of physical conditions on October 6, 2016.  AR222; AR3182-98; AR2832; AR3043.  Plaintiff became disabled and stopped working in October 2016 "due to polyneuropathy, encephalopathy and bacterial infection."  AR2829.  Plaintiff also had "secondary diagnoses of headache, fibromyalgia and chronic pain."  AR2829.  Plaintiff left his employment because he was unable to perform his job duties due to severe, intractable constant head pain, neuropathy, muscle and joint pain, numbness, tingling, fatigue, memory issues, and brain fog.  AR933-37.  Plaintiff's job duties required sitting, typing, and standing for extended periods of time, business travel, mental work, and effectively communicating challenging concepts to others.  AR933-34.  Plaintiff's occupation is a sedentary or "light occupation," meaning that the physical demand level for his occupation is "light work," which requires exerting up to 20 pounds of force occasionally, up to 10 pounds of force frequently, and a negligible amount of force constantly.  AR2831.

Plaintiff received short-term disability benefits under the Group Policy from 2016 until April 5, 2017.  AR2765; AR2829.  On April 5, 2017, Aetna Defendants approved Plaintiff's claim for LTD benefits.  AR0097.

As part of his LTD benefits claim, Plaintiff reported an onset of symptoms in March 2010.  *See* AR2829-32.  The records that Plaintiff submitted in support of his claim show that, since 2010, he has been diagnosed with and treated for a variety of physical conditions.  In 2011, Plaintiff was diagnosed by Dr. Christine Green, a specialist in chronic infectious diseases, with various "tick borne diseases" ("TBDs"), which include chronic or persistent Lyme disease.

AR777-83.  In 2014, Dr. James A. Davis, a rheumatologist, diagnosed Plaintiff with fibromyalgia and opined that fibromyalgia "would account for [Plaintiff's] chronic pain and reproducible tender spots."  AR953.  In 2017, Plaintiff was diagnosed with autoimmune peripheral neuropathy and small fiber neuropathy by Dr. David L. Kaufman, a specialist in complex diseases, who stated that he believed that Plaintiff's "autoimmune disease is the cause of his misery."  *See* AR1924.  Plaintiff has been treated for pain by Dr. Lewis, a pain medicine specialist, since 2014, AR2891, and for fibromyalgia by Dr. Melissa Congdon, a specialist in the treatment of fibromyalgia, since 2017.  AR788.

As will be discussed in more detail below, Aetna Defendants terminated Plaintiff's LTD benefits twice since April 7, 2017.  Only the second termination is at issue in this litigation.

The first termination took place in January 2018, after Aetna Defendants consulted with three peer reviewers who specialized in infectious diseases (Dr. Crossley), rheumatology (Dr. Ash), and neurology (Dr. Sims), who opined based on a paper review of Plaintiff's medical records that Plaintiff was not functionally impaired because of a physical condition and could work full time.  Plaintiff appealed the termination.  In August 2018, Aetna Defendants reversed the termination of his LTD benefits, effective as of January 2018.  The reversal was based on the report of a fourth peer reviewer (Dr. Stauber, internal medicine), who opined that Plaintiff was not capable of working full-time after reviewing Plaintiff's medical records and watching videos of Plaintiff's hands and legs.

The second termination took place in April 2019 and June 2019, after a physician who specializes in internal medicine and occupational medicine, Dr. Allems, conducted an independent medical examination of Plaintiff in March 2019.  Dr. Allems opined that Plaintiff was unable to sit, stand, walk, or perform fine manipulation (e.g., typing) for more than 2.5 hours in an eight-hour workday, and that those impairments were caused by a "profound depression" and "probable conversion disorder," and not a physical condition.  In April 2019, Defendants notified Plaintiff via a letter that they had determined, based on Dr. Allems' opinions, that he was not disabled due to any physical condition but that he was totally disabled from any reasonable occupation due to a mental health condition.  Aetna Defendants terminated Plaintiff's LTD benefits based on a

physical condition as of April 2019 and informed Plaintiff that they would continue his LTD benefits based on a mental health condition beyond April 2019 subject to the 24-month mental health limitation, but that he was required to submit proof within 60 days that he was under the care of physician who specialized in psychiatry per the "regular care of a physician" provision. Plaintiff objected to those determinations and declined to submit proof that he was receiving treatment from a psychiatrist.  Between April 2019 and June 28, 2019, Aetna Defendants paid Plaintiff LTD benefits based on a mental health condition only.  On June 28, 2019, Aetna Defendants terminated Plaintiff's LTD benefits based on a mental health condition, on the basis that he had failed to submit proof that he was under the care of a psychiatrist as required under the "regular care of a physician" provision.  On the same date, Aetna Defendants reaffirmed their April 2019 determination that Plaintiff was not disabled from any reasonable occupation due to a physical condition based on Dr. Allems' IME and that his LTD benefits based on a physical condition had been terminated as of April 2019.  Plaintiff appealed those determinations.

In March 2020, Aetna Defendants denied Plaintiff's appeal and upheld their termination of Plaintiff's LTD benefits effective as of June 28, 2019.  In doing so, Defendants relied on Dr. Allems' IME report again; the reports of two other peer reviewers, Dr. Hoenig (pain medicine) and Dr. Polanco (occupational medicine); and an employment analysis report, to support their determination that Plaintiff no longer met the test of disability of being totally disabled from any reasonable occupation because of a physical condition.  Defendants do not appear to have reconsidered April 2019 and June 2019 determination, based on Dr. Allems' IME report, that Plaintiff's disability was caused by a mental health condition and that, as a result, he was required to submit proof that he was under the care of a psychiatrist under the "regular care of a physician" provision.  Aetna Defendants nevertheless upheld their termination of Plaintiff's LTD benefits based on his failure to submit proof that he was under the care of a psychiatrist.

Plaintiff's claim for benefits under Section 502(a)(1)(B) is based on the theory that Defendants abused their discretion in terminating his LTD benefits as of June 28, 2019.

**C.      First Termination of Plaintiff's LTD Benefits and Reinstatement of the Same**

As noted, Aetna Defendants approved Plaintiff's claim for long-term disability benefits on

1   April 5, 2017.  AR97.

2   In January 2018, Aetna Defendants retained, via a third-party vendor, three physician

3   consultants who specialized in infectious diseases, rheumatology, and neurology, respectively, to

4   review Plaintiff's medical records to determine whether he continued to meet the Test of

5   Disability under the Group Policy's "your own occupation" standard.

6   On January 5, 2018, Dr. Kent Crossley, an infectious disease specialist, reviewed

7   Plaintiff's medical records and issued a report in which he concluded that there is no evidence that

8   Plaintiff suffered from any infectious-disease-related illness.  AR1425-31.  Dr. Crossley opined

9   that he saw no evidence in Plaintiff's medical records that he "would be unable to work full-time

10  on an at least light physical demand level, per DOT/DOL definitions."  AR1431.

11  On January 5, 2018, Dr. Julia Ash, who is board certified in rheumatology, reviewed

12  Plaintiff's medical records and issued a report in which she concluded that Plaintiff's diagnosis of

13  fibromyalgia, which she attributed to Plaintiff's treating physician Dr. Congdon, "is not clearly

14  established," and that Plaintiff's medical records did not indicate that he satisfied the criteria for a

15  fibromyalgia diagnosis according of the American College of Rheumatology, which, according to

16  her report, requires documentation of 11/18 established "tender points" and "complaints of

17  widespread pain."  AR1436.  Dr. Ash did not mention, and therefore does not appear to have taken

18  into account, Dr. Davis' 2014 fibromyalgia diagnosis or his opinion that Plaintiff's fibromyalgia

19  would "account for [his] chronic pain and reproducible tender spots."  AR953.  Dr. Ash also

20  concluded that Plaintiff's diagnosis of autoimmune rheumatic disease was not supported by

21  Plaintiff's medical records.  AR1437.  Dr. Ash concluded that Plaintiff could work full time but

22  with some restrictions, such as by taking five-minute breaks every two hours for stretching and

23  rest.  AR1438.

24  On January 5, 2018, Dr. Ronald Sims, a board-certified neurologist, conducted a review of

25  Plaintiff's medical records and issued a report in which he concluded that Plaintiff had an

26  "impairment caused by peripheral neuropathy of undetermined etiology, which causes the

27  following restrictions/limitations: he can work eight hours a day, five days a week" with frequent

28  sitting, standing, walking, and fingering.  AR1447.  He noted that Plaintiff had a skin biopsy in

United States District Court
Northern District of California

9

2017 that showed reduced epidermal nerve fiber density consistent with small fiber neuropathy. AR1445.  Dr. Sims concluded that the "total evidence available does not support a finding of a neurological impairment caused by Lyme disease."  AR1446-48.  However, Dr. Sims noted that the "diagnosis of peripheral neuropathy is consistent, somewhat, with the claimant's self-reported symptoms and is supported by the epidermal biopsy of reduced nerve fiber density.  Normal findings on NCS/EMG neither do not rule out nor support the diagnosis of small-fiber polyneuropathy.  The documented findings of neurological examinations do not provide much support for the diagnosis of polyneuropathy, but many of the examinations are brief and undetailed."  AR1446.  Dr. Sims further noted that it is "unlikely that the peripheral neuropathy will improve, since it has been treated extensively without apparent improvement."  AR1447.

On January 12, 2018, Aetna Defendants sent Plaintiff a letter stating that he was no longer eligible for LTD benefits and that they had terminated his LTD benefits as of January 13, 2018, on the ground that the reports of Dr. Crossley, Dr. Ash, and Dr. Sims showed that Plaintiff could perform his own occupation.  AR2830-33.

In February 2018, Plaintiff appealed the termination.  AR2842.  As part of his appeal, Plaintiff submitted a letter dated May 5, 2018, by his treating physician, Dr. Christine Green, an expert in chronic infectious diseases and "persistent (chronic) Lyme disease."  AR1248.  Dr. Green stated that Plaintiff was disabled because of "a chronic illness that was caused by several tick-borne disease infections confirmed by opportunistic infection."  AR1248.  Dr. Green described her qualifications for diagnosing chronic illnesses caused by tick-borne infections. AR1248.  Dr. Green stated that clinical and laboratory data supported the presence in Plaintiff of pathogens *Borrelia burgdoferi*, the agent of Lyme disease, as well as *Babesia duncani*, *Bartonella hensellae*, and quintana and the human herpes virus.  AR1248-49.  She noted that Plaintiff's disease has persisted despite having received antimicrobial, immune supportive, and physical therapy.  AR1251.  She explained that a "poorly understood aspect of tick-borne disease is the persistence over time" and that studies show that some pathogens can survive exposure to the antibiotics commonly used to treat Lyme disease.  AR1251.  Dr. Green concluded that Plaintiff was disabled and could not perform the functions of any occupation, including his own.  AR1251.

1    She noted that Plaintiff "carries no psychiatric diagnosis"; that he had been diagnosed with

2    fibromyalgia, migraine, facial palsy, cranial nerve disfunction, motor polyneuropathy, among

3    other conditions; and that he "cannot function" due to marked pain, prostrating fatigue, cognitive

4    limitations in memory, focus, and executive functions.  AR1212-14.

5          Plaintiff also submitted a May 2, 2018, letter by another of his treating physicians, Dr.

6    David L. Kaufman, an expert in complex diseases.  Dr. Kaufman wrote that Plaintiff suffers from

7    autoimmune autonomic neuropathy and inflammatory polyneuropathy and opined that Plaintiff is

8    "totally disabled" and cannot engage in any full time or part time work.  AR1219-20.  Dr.

9    Kaufman noted that a 2017 skin biopsy was "definitely positive for Small Fiber Neuropathy

10   (SFN)."  AR1219.  Dr. Kaufman also noted that "[e]xtensive diagnostic testing over the last 7

11   years demonstrated many key abnormalities including an abnormal PET scan, multiple lumbar

12   punctures with elevated protein levels, and positive serologic markers for infection."  AR1219.

13   Dr. Kaufman further noted that he had requested a trial of intravenous immune globulin therapy

14   (IVIG) for Plaintiff in light of his history, testing data, and failure to respond to other medications

15   and protocols over the previous seven years, and that Plaintiff's health insurance company

16   approved the treatment despite its high cost.  AR1219.

17         For the purpose of resolving Plaintiff's appeal, Defendants retained, via a third-party

18   vendor, a physician who is board certified in internal medicine, Dr. Stuart Stauber, to review

19   Plaintiff's medical files and a video of Plaintiff's hands and legs.  AR1343.  Dr. Stauber

20   concluded that the "medical records support[ed] the claimant's self-reported complaints," and that

21   "[t]hroughout the documentation, the claimant's complaints are consistent, but worsening in

22   severity and include facial numbness and tingling, muscle/joint aches, fatigue and multiple

23   neurologic complaints."  AR1343.  He also stated that Ehrlich's "self-reported symptoms are

24   largely subjective in nature" and that "medical work-up to date has failed to provide an

25   explanation or adequate treatment option to address this claimant's complaints."  AR1343-44.

26   However, Dr. Stauber opined that the fact that Plaintiff had continued to describe symptoms over

27   a long period of time suggested the presence of functional limitations.  AR1343.  Dr. Stauber

28   reviewed a thirty-second video submitted by Plaintiff, which showed "fingers on a keyboard

shaking with apparent difficulty striking the keys and then switches to show shaking legs."

AR1344.  Dr. Stauber opined that "the video confirms that this claimant would have significant

difficulty performing a task requiring typing on a keyboard or standing for any length of time,"

and that as a result, Plaintiff did not have "full time functionality."  AR1344.

On August 15, 2018, Aetna Defendants reversed their decision to terminate Plaintiff's

LTD benefits and reinstated his LTD benefits, effective as of January 13, 2018.  AR2849-50.  The

letter that Defendants sent to Plaintiff does not state the reason why they reversed the termination.

*See id*.  However, Defendants entered the following note into their system in connection with the

reinstatement of benefits: "Medical review completed on appeal determined that EE complaints

are consistent with evidence seen on video.  Although EE still has no definitive diagnosis, the

exam findings are also consistent with complaints.  Peer [Dr. Stauber] found reasonable

restriction include no use of keyboard, and EE is unable to work on a full-time basis.  Since

restrictions fall outside occupational requirements, original decision to terminate benefits has

been overturned on appeal."  AR188-89.

**D.      Independent Medical Examination that Led to Second Termination of Benefits**

On November 27, 2018, Aetna Defendants sent Plaintiff a letter stating that, to continue to

receive LTD benefits past April 4, 2019, he would need to "meet a stricter definition of

disability," namely that he is "unable to work at *any* reasonable occupation [as opposed to his

own occupation] solely because of an illness, injury or disabling pregnancy-related condition."

AR2857 (emphasis added).  To determine Plaintiff's ongoing eligibility for LTD benefits,

Defendants retained, via a third-party vendor, a physician who specializes in internal medicine

and occupational medicine, Dr. Thomas Allems, to perform an independent medical evaluation

("IME") of Plaintiff.   The IME took place on March 27, 2019.  Dr. Allems issued his IME report

on April 17, 2019.  AR2871.

According to Dr. Allems' report, the referral for the IME was "for a disability evaluation

on the basis of chronic Lyme disease and fibromyalgia."  AR2871.  Dr. Allems summarized the

"day-to-day symptoms" that Plaintiff claimed prevented him from working, which included pain

and pressure in his head, arms, legs, and joints; paresthesias (tingling/numbness); fatigue; brain

fog; difficulty concentrating; nausea; hand tremors; and muscle weakness. AR2873, AR2893. Plaintiff reported that none of the medications and medical treatments he had received to date had resolved his symptoms. AR2873, 2894. Dr. Allems conducted a physical evaluation of Plaintiff and noted that Plaintiff exhibited extreme and "non-organic" pain and distress behaviors and that Plaintiff did not exhibit a gait disturbance or tremors when distracted. *See* AR2900-01. Despite those observations, Dr. Allems ruled out malingering. AR2893.

As part of his IME, Dr. Allems conducted a physical abilities assessment of Plaintiff. AR2903. Dr. Allems found that Plaintiff could not sit, stand, walk, or perform fine manipulation with his hands (e.g., typing) for more than 2.5 hours in an eight-hour workday. AR2903. Dr. Allems concluded that these impairments were "due to untreated psychopathology, quite clearly severe depression that has likely entered the realm of a conversion disorder, and the effects of inappropriate polypharmacy (including opiates that dull mentation and contribute to depression) and the inappropriate reinforcement by his current treaters that he has a grave disabling medical condition that no one can diagnose or treat, while subjecting him to unorthodox and ineffective testing and treatments." AR2901. Dr. Allems' IME report states that he diagnosed Plaintiff with "severe untreated psychopathology masquerading as physical illness, probable conversion disorder and profound depression[.]" *See* AR2893 (listing these mental illnesses under "diagnoses" in his report). Dr. Allems' report does not state that he conducted tests to determine whether Plaintiff suffered from any mental illness, to determine the severity of any such mental illness, or to determine whether any such mental illness caused Plaintiff's impairments. Dr. Allems did not explain in his report how he reached the conclusion that Plaintiff's physical impairments were caused by the mental illnesses he described in his report. *See generally* AR2870-2901.

Dr. Allems also concluded, based on his review of Plaintiff's medical records and his physical examination of Plaintiff, that Plaintiff was "not medically disabled on the basis of chronic inflammatory demyelinating polyneuritis (CIDP), primary stabbing headache, chronic Lyme disease, fibromyalgia or hereditary or idiopathic neuropathy." AR2901. Dr. Allems concluded that Plaintiff's "dominant problem at this point is chronic daily headache syndrome,"

13

1   which he opined was "most likely due to his inappropriate opiate regime," which involved daily

2   doses of Oxycodone prescribed by Dr. Lewis.  AR2893-94.

3        With respect to possible neurological or immune disorders, Dr. Allems explained that,

4   despite having had various tests and workups, none had established any neurological diagnosis or

5   that Plaintiff suffers from an immune disorder.  AR2893.  Specifically, Dr. Allems noted that "the

6   medical records do not document any neurological disorder other than nerve entrapment at the

7   elbows (golfers elbow) referenced in 2010."  AR2901**.**  Dr. Allems reached this conclusion even

8   though his report acknowledges that a biopsy of Plaintiff in 2017 showed "significant reduced

9   epidermal nerve fiber density consistent with small fiber neuropathy[.]"  *See* AR2887.  Dr.

10  Allems did not acknowledge or discuss in his report Dr. Kaufman's 2017 diagnoses of small fiber

11  neuropathy and autoimmune peripheral neuropathy and 2018 diagnoses of autoimmune

12  autonomic neuropathy and inflammatory polyneuropathy, *see* AR1924, AR1219-20.

13       With respect to fibromyalgia, Dr. Allems described the condition as "a functional disorder

14  based exclusively on subjective reports of widespread pain complaints and nonrestorative

15  sleep[.]"  AR2893.  Dr. Allems acknowledged that Plaintiff had been diagnosed with

16  fibromyalgia, *see, e.g.*, AR2888, AR2890, but he did not provide any explanation for why he

17  concluded that Plaintiff's reported pain and impairments were not caused by that condition.

18       With respect to chronic Lyme disease, Dr. Allems explained that Plaintiff's symptoms and

19  impairments were not caused by that illness because Plaintiff had none of the recognized

20  objectifiable complications from Lyme disease, and because his serologies were negative for a

21  current infection with the *borrelia burgdorferi* organism that causes Lyme disease.  AR2897.  Dr.

22  Allems noted that Plaintiff's "medical care (particularly with Dr. Green and her extreme use of

23  unnecessary and ineffective antibiotics) has been driven by a smorgasbord of unnecessary and

24  clinically uninterpretable (or meaningless) tests."  AR2893.

25       Following their receipt of Dr. Allems' IME report, Defendants entered the following claim

26  note into their system:

27           It appears the employee is not physically disabled and the
             underlying condition is tied to mental health.  It would appear
28           prudent to send a letter limiting benefits to whatever the policy

> limit for mental health is.  Further, Dr. Allem¿s [sic] is an internal
> medicine physician who may not be the ideal physician to
> comment on mental health.  Ideally it¿d [sic] be a psychiatrist or
> psychologist to comment on severity of depression and conversion
> disorder.

AR258.

### E.  Second Termination of LTD benefits based on IME

On April 26, 2019, Aetna Defendants sent Plaintiff a letter stating that, based on the

results of the IME conducted by Dr. Allems, Plaintiff *did* meet the Plan's test of disability ("you

do meet this definition of being totally disabled from any gainful occupation at this time") but

only because of a mental, and not a physical, condition.  AR2861-63.  This letter (hereinafter, the

"April 2019 letter") quoted Dr. Allems' opinion that Plaintiff "is not medically disabled on the

basis of chronic inflammatory demyelinating polyneuritis, CIDP, primary stabbing headache,

chronic Lyme disease, fibromyalgia or hereditary or idiopathic neuropathy," as well as his

opinion that, "[a]t the present time, his impairments are due to untreated psychopathology, quite

clearly severe depression that has likely entered the realm of conversion disorder[.]"  AR2862.

The April 2019 letter stated that Plaintiff's LTD benefits would continue "due to a mental

condition" subject to the 24-month mental health limitation, which limits LTD benefits to 24

months where a disability is "primarily caused by" a mental health or psychiatric condition.

AR2863.  According to the letter, the 24-month period began as of April 26, 2019.  AR2863.  The

letter further stated that, pursuant to the "regular care of a physician" provision of the Group

Policy, Plaintiff "will need to establish care with a provider" that specializes "in psychiatry, if

your disability is caused, to any extent, by a mental health or psychiatric condition" and whose

treatment is consistent with the diagnosis of the disabling condition.  AR2862.  The April 2019

letter further stated:

> We are allowing you 60 days to provide us with documentation
> that you are under the care of a licensed provider that is
> appropriate for your condition.  If you do not provide this
> information to support your continued eligibility for benefits, your
> benefits will terminate and your claim will be closed.

AR2863.  By stating that Plaintiff's LTD benefits would continue beyond April 2019 only "due to

a mental condition," this letter had the effect of terminating Plaintiff's LTD benefits based on a

United States District Court
Northern District of California

1    physical condition.  *See id.*  The letter did not notify Plaintiff of what information he could submit

2    to perfect his LTD benefits claim based on a physical condition.

3            On May 29, 2019, Plaintiff sent Aetna Defendants a letter appealing their April 26, 2019,

4    determinations.  AR883.  Aetna Defendants acknowledged the appeal in their internal claim

5    notes.  AR276.

6            On June 28, 2019, Aetna Defendants sent Plaintiff a letter (hereinafter, "June 2019 letter")

7    that stated: "[w]e're no longer approving your Long-Term Disability (LTD claim)" starting as of

8    the date of the letter and "we are terminating your benefits with benefits paid through June 27,

9    2019."  AR2915.  The letter stated that, as of April 26, 2019, Plaintiff was "no longer receiving

10   LTD benefits due to a physical condition but due to a mental health condition" in light of Dr.

11   Allems' IME report.  AR2916.  Because Plaintiff failed to provide "additional medical support of

12   a disability due to a physical diagnosis" or "evidence that [Plaintiff had] established care with a

13   provider that has the medical training and clinical expertise suitable to treat [his] mental health

14   disabling condition," Aetna Defendants concluded that Plaintiff was "no longer eligible for

15   benefits" under the Group Policy and terminated his LTD benefits as of June 28, 2019.  AR2916-

16   17.

17           The June 2019 letter stated that Aetna Defendants' evaluation of Plaintiff's claim "took

18   into consideration the opinions of [his] treating provider" and "all of the information available to

19   us and the group policy provisions applicable to [his] claim."  AR2917.  The letter, however, did

20   not discuss any of the opinions of Plaintiffs' treating physicians.  *See id.*  The letter further stated

21   that if Plaintiff did not agree with Aetna Defendants' determinations, he could appeal them.

22   AR2918.  The letter provided that Aetna Defendants would review any additional information

23   Plaintiff cared to submit, and it listed general examples of evidence he could submit[6], but it did

24   _____

25   [6] The general examples of evidence that Plaintiff could submit that were described in the letter
     were: a "detailed narrative report for the period 4/4/2019 through current outlining the specific
26   physical and/or mental limitations related to your condition that your doctor has placed on you as
     far as gainful activity is concerned; physician's prognosis, including course of treatment,
27   frequency of visits, and specific medications prescribed; diagnostic studies conducted during the
     above period, such as test results, X-rays, laboratory data, and clinical findings; any information
28   specific to the condition(s) related to your disability claim that would assist with the evaluation of
     your disability status; and any other information or documentation that would assist with the

1   not notify Plaintiff of what information he needed to submit to perfect his claim for LTD benefits

2   based on a physical condition or explain why the medical information that Plaintiff had submitted

3   as of the date of the letter was insufficient to establish that he was disabled because of a physical

4   condition.

**F.      Social Security Administration's Award of Disability Benefits**

6          On July 31, 2019, the Social Security Administration ("SSA") awarded Plaintiff disability

7   benefits on the basis that Plaintiff had been disabled since October 5, 2016.  *See* AR876. The SSA

8   found that Plaintiff had the "severe impairments" of "major depressive disorder, anxiety disorder,

9   not otherwise specified; rule out neurocognitive disorder, Lyme disease; fibromyalgia; and

10  headaches."  AR0870.  The SSA further found that "the medical evidence corroborates the

11  opinions that the claimant suffers from severe pain and fatigue secondary to fibromyalgia and

12  Lyme disease, which are reasonably found to significantly limit his ability to persist over the

13  course of an 8-hour workday, and work week.  Moreover, depression, anxiety, and a

14  neurocognitive disorder also impair the claimant's ability to maintain focus and limit him to simple

15  tasks."  AR875.  Notably, the SSA found that Plaintiff's "moderate symptoms of depression" were

16  "secondary to fibromyalgia."  AR874.  The SSA concluded that Plaintiff was unable to perform

17  past relevant work or any other job in the national economy because he could not perform basic

18  work activities that included physical functions such as walking, standing, and sitting, or mental

19  functions such as understanding and remembering.  AR871, 875-76.  While the SSA found that

20  Plaintiff's anxiety and depression impacted his cognitive functions, there is no indication that the

21  SSA attributed any of Plaintiff's physical impairments to depression or any other mental illness, as

22  Dr. Allems did.

23         Plaintiff provided a copy of the SSA's opinion to Aetna Defendants on August 6, 2019.

24  AR865.  Aetna Defendants obtained authorization to request Plaintiff's social security benefits file

25  from the SSA two years earlier, in 2017.  *See* AR147.

**G.      Plaintiff's Appeal of the Second Termination of LTD benefits**

27

28  review of your claim."  *See* AR2917.

United States District Court
Northern District of California

On June 30, 2019, Plaintiff appealed Aetna Defendants' termination of his LTD benefits as of June 28, 2019, by resubmitting his May 29, 2019, letter.  *See* AR292; AR2923.  Plaintiff indicated to Aetna Defendants that he planned to submit additional information in support of his appeal.  *See id.*; *see also* AR2927-30.

On October 4, 2019, Plaintiff sent a letter to Defendants in support of his appeal.  AR799.  There, Plaintiff argued that Defendants had erred in concluding, based on Dr. Allems' IME, that Plaintiff's disability was caused by a mental health condition and not a physical condition; that the 24-month mental health limitation applied to his claim for LTD benefits; and that Plaintiff was required to submit proof that the was under the care of a physician who specialized in psychiatry.  AR799-811.  Plaintiff argued that Dr. Allems was not qualified to opine on whether his disability was caused by a mental illness and that Defendants abused their discretion by relying exclusively on Dr. Allems' opinions to conclude that his disability was caused by a mental illness.  AR800-801.  Plaintiff also argued that all of his treating physicians had concluded that his disability was caused by a physical condition and not a mental illness, AR801, and that his depression and anxiety were caused by his physical illnesses.  AR803.  Plaintiff did not appeal or otherwise challenge Dr. Allems' opinions that he is not capable of sitting, standing, walking, or performing fine manipulation for more than 2.5 hours in an eight-hour workday.  *See id.*

On November 15, 2019, Plaintiff wrote another letter to Defendants objecting to their reliance on Dr. Allems' IME report to terminate his LTD benefits as of June 2019, arguing that Dr. Allems was not qualified to diagnose mental illnesses, Lyme disease, fibromyalgia, or autoimmune diseases.  AR755.  Attached to this letter was a declaration by Plaintiff dated November 13, 2019.  AR761-72.  Plaintiff declared that he could not perform the duties of his occupation or any other occupation because he could not sit, stand, walk, or type for significant periods of time because of symptoms that included pain, shaking, numbness, fatigue, and inability to concentrate.  AR761-62.  Plaintiff disagreed with Dr. Allems' opinion that his dominant problem was chronic daily headaches.  AR766.  Plaintiff represented that his depression was a symptom of his physical illnesses and conditions and that his treating doctors were successfully managing his depression with medication.  AR765.

In November 2019, Plaintiff also submitted a letter by his treating physician, Dr. Green. AR776.  Dr. Green stated that Dr. Allems did not have the expertise necessary to diagnose chronic infectious diseases, whereas she did.  AR776.  Dr. Green explained that Plaintiff's testing results since 2011 showed objective findings that are consistent with "tick borne pathogens" and that peer reviewed publications and studies show that tick borne pathogens can persist even after antibiotic therapy.  AR780-82.  She also stated that Plaintiff exhibits many of the signs of late complications of Lyme disease and explained why she believes that is the case.  AR783.  She also stated that Dr. Allems' report appears to rely on guidelines for the standard of care for Lyme disease that are outdated and have been superseded.  AR783.  She noted that Plaintiff "has no evidence of psychiatric illness and is not psychiatrically disabled."  AR776.

Plaintiff also submitted a letter by Dr. Congdon dated October 7, 2019, which states that Plaintiff has fibromyalgia and that his disability from fibromyalgia is not caused to any extent by a mental health or psychiatric condition.  AR788.  Dr. Green noted that depression is a common symptom fibromyalgia.  AR788.

To resolve Plaintiff's appeal, Aetna Defendants retained, via a third-party vendor, two additional physicians, Dr. David Hoenig (pain medicine) and Dr. Frank Polanco (occupational medicine), to conduct reviews of Plaintiff's medical files.

Dr. Hoenig, who is board certified in pain medicine, neurology, and brain injury medicine, AR728, was asked to determine from a "pain medicine perspective" only whether Plaintiff "was functionally impaired from June 28, 2019, to the present."  AR722.  Dr. Hoenig reviewed Plaintiff's medical records and issued a report dated December 19, 2019.  Dr. Hoenig noted that peer reviews of Plaintiff's medical records were conducted by reviewers specializing in neurology, rheumatology, and infectious disease, and that an IME was conducted by a physician in "occupational medicine."  AR722.  In other words, Aetna Defendants provided to Dr. Hoenig the reports of Dr. Sims, Dr. Ash, Dr. Crossley, and Dr. Allems.  Dr. Hoenig stated in his report that, for the dates of June 2018, "to the present," Plaintiff did not have a "primary diagnosis" and that there was "no documentation of a detailed history and physical examination submitted for review." AR724-26.  Dr. Hoenig further concluded that, for the time period in question, "the claimant's

1   symptoms and complaints are not explained by the medical findings, and it is not clear if the

2   claimant's complaints are presented consistently throughout the course of treatment," AR725; and

3   that the medical record "does not support functional impairment as of June 28, 2019, to the

4   present."  AR726.

5          Dr. Polanco, who is board certified in occupational medicine, conducted a paper review to

6   determine Plaintiff's impairments from June 28, 2019 "to the present" from an "occupational

7   medicine perspective" only.  AR709.  In his report, Dr. Polanco noted that peer reviews of

8   Plaintiff's medical records were conducted by reviewers specializing in neurology, rheumatology,

9   and infectious disease and that an IME was conducted by a physician in "occupational medicine."

10  AR709.  This means that Defendants provided to Dr. Polanco the reports of Dr. Sims, Dr. Ash, Dr.

11  Crossley, and Dr. Allems.  Based on surveillance videos taken of Plaintiff on October 31, 2017,

12  and November 1, 2017, Dr. Polanco disagreed with Dr. Allems' opinion that Plaintiff could not sit,

13  walk, stand, or perform fine manipulation for more than 2.5 hours in a workday.  *See* AR714-16.

14  Dr. Polanco noted, however, that individuals depicted on the surveillance videos he reviewed for

15  the purpose of his report had "different appearances," because one had hair and the other did not.

16  *See* AR715.  Dr. Polanco concluded that Plaintiff was capable of working full time, with some

17  restrictions for walking, standing, sitting, and lifting.  AR714-17.  Those restrictions were: sitting

18  limited to six hours at a time; frequent gripping, grasping, and fingering; and occasional lifting and

19  carrying up to 25 pounds.  AR717.

20         On January 8, 2020, Plaintiff's attorney sent a letter to Aetna Defendants stating that at

21  least one of the surveillance videos that Dr. Polanco had relied upon to opine that Plaintiff can

22  work full time depicted Plaintiff's nurse, not Plaintiff.  *See* AR 675-76.  In their briefs, Defendants

23  admit that the "person observed on November 1, 2017" in the surveillance videos "was not the

24  Plaintiff[.]"  *See* ECF No. 64 at 12 n.5.

25         On January 3, 2020, an Employability Analysis Report was prepared at Defendants' request

26  by Karen McCormack, a rehabilitation case manager, for the purpose of determining Plaintiff's

27  "current employability."  AR702.  The analysis relied on the restrictions and limitations that Dr.

28  Polanco included in his report of December 23, 2019, which were that Plaintiff can work full-time

United States District Court
Northern District of California

with some restrictions for sitting and lifting.  AR702.  The analysis identified zero occupations that satisfied Plaintiff's monthly earning requirements and that Plaintiff could perform with the restrictions and limitations noted in Dr. Polanco's report.  AR703-04.  The Report states that, although "no occupations were identified" that Plaintiff could perform with his restrictions and limitations, it is "this Rehabilitation Case Manager's opinion that based on the physical restrictions provided by Dr. Polanco, Mr. Ehrlich would be capable of performing an occupation similar to the one he was performing for the policyholder. . . . He would be able to perform his job with alternating between sitting, standing, and walking and lifting up to 25 pounds."  AR704.

On February 24, 2020, Dr. Hoenig issued an addendum to his December 2019 report in which he considered new evidence that Plaintiff had submitted for the time period of August 2019 to January 2020.  AR478.  Dr. Hoenig opined, from a pain medicine perspective only, that Plaintiff's complaints "are presented consistently throughout the course of treatment" but that his symptoms and complaints "are not clearly explained by the medical findings."  AR481.  He further noted that a "clear unifying diagnosis is not identified" for Plaintiff.  AR481.  Dr. Hoenig acknowledged that Plaintiff reported having pain across his body that made it difficult for him to sit, walk, stand, and type, but Dr. Hoenig concluded that Plaintiff's medical records did "not support this as causing functional impairment from June 28, 2019 to the present."  AR482-83.

On February 26, 2020, Dr. Polanco issued an addendum to his December 2019 report "from an Occupational Medicine perspective only."  AR470.  Dr. Polanco reviewed additional records that Plaintiff provided in support of his appeal dated August 2019 to January 2020.  AR470-71.  Dr. Polanco opined that Plaintiff's primary diagnosis is "peripheral neuropathy" and that the medical records do "support the diagnosis of peripheral neuropathy with decreased sensation and pain in his upper and lower extremities."  AR473.  Dr. Polanco nevertheless concluded that "the findings do not reflect that [Plaintiff] is incapacitated or incapable of full-time" work.  AR474.  Dr. Polanco recommended the same restrictions for walking, standing, sitting, and lifting that he recommended in his December 2019 report.  AR474.  Dr. Polanco's addendum does not discuss the fact that some of the surveillance video he relied upon for his December 2019 report had depicted a person who was not Plaintiff, even though Plaintiff's counsel alerted Aetna

1   Defendants of that fact in January 2020.

2   　　Plaintiff also submitted in support of his appeal physiotherapy records dated January 14, 21

3   and 27, 2020, and videos taken in February 2020 of his trembling hands.  AR348.  Defendants'

4   claim notes indicate that the videos were not considered for the purpose of Plaintiff's appeal

5   "because there was no authenticity submitted with the videos" to establish that the hands depicted

6   were Plaintiff's.  AR348.  There is no indication in the record that Defendants alerted Plaintiff of

7   the fact that they needed additional information to "authenticate" the hands depicted in the videos

8   so that they could be considered for the purpose of resolving his appeal.

9   　　**H.   Defendants' Denial of Plaintiff's Appeal of Second Termination of Benefits**

10   　　On March 5, 2020, Aetna Defendants sent Plaintiff a letter (hereinafter, "March 2020 final

11   denial letter") in which they upheld their decision to terminate his LTD benefits as of June 28,

12   2019, based on a mental health condition and based on a physical condition.  AR3043.

13   　　With respect to Plaintiff's LTD benefits claim based on a mental health condition, the letter

14   stated that, as of June 28, 2019, Plaintiff had not submitted evidence that he had established care

15   with a psychiatrist for his mental health condition; that neither Plaintiff nor his providers "had

16   provided medical records to support a disability due to his mental health conditions"; and that

17   Plaintiff had not provided Aetna Defendants with "mental health documentation from a mental

18   health professional as defined in the LTD plan to determine if he was disabled from a mental

19   health condition from June 28, 2019, to the present."  AR3043, AR3046.  Aetna Defendants,

20   therefore, concluded that Plaintiff "did not meet the plan provisions, as of June 28, 2019, for a

21   mental health disability."  AR3043.  The letter contains no indication that Aetna Defendants

22   reviewed their April 2019 and June 2019 determinations, based on Dr. Allems' IME report, that

23   Plaintiff's disability was caused by a mental illness and that Plaintiff was required to submit proof

24   that he was under the care of a psychiatrist under the "regular care of a physician" provision.

25   　　With respect to Plaintiff's LTD benefits claim based on a physical condition, the March

26   2020 final denial letter stated that Aetna Defendants concluded that Plaintiff "no longer meets the

27   policy definition of Disability of being totally disabled from any reasonable occupation for which

28   he qualified for by education, training or experience due to his physical condition."  AR3046.  This

United States District Court
Northern District of California

was due to a "lack of medical evidence to support a physical impairment." AR3043. Although the March 2020 final denial letter mentioned some of the medical evidence that Plaintiff had submitted in support of his appeal, all of which indicated that Plaintiff continued to experience debilitating pain and that his restrictions and limitations had not improved meaningfully, *see* AR3045-46, the letter indicates that Aetna Defendants did not credit that evidence and that they, instead, credited the opinions of Defendants' peer reviewers (Dr. Hoenig and Dr. Polanco) and the Employability Analysis Report of January 2020. *See* AR3045-46. The letter stated that, based on Dr. Hoenig's paper review, Plaintiff's symptoms and complaints were "not clearly explained by the medical findings" and that his "self-reports of wide spread pain that he claims causes his difficulty with sitting, standing, walking and typing, were not supported by the medical documentation provided." AR3045. It further stated that, based on Dr. Polanco's paper review, Plaintiff was not "incapable of full time activities, as he had retained a functional gait, mobility, strength, and had no focal neurological deficits." AR3045. The letter cited the Employability Analysis Report of January 2020, which relied on Dr. Polanco's opinions, to support Aetna Defendants' determination that Plaintiff was employable and could perform his own job "with alternating between sitting, standing, and walking[.]" AR3046.

### III.   JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

### IV.   CONCLUSIONS OF LAW

#### A.   Claim for Benefits Under Section 502(a)(1)(B)

##### 1.   Legal Standard

Under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought by a participant, beneficiary, or fiduciary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. As noted above, the Court previously concluded that the standard of review for Plaintiff's claim for benefits is abuse of discretion.

Under the abuse of discretion standard, "a plan administrator's decision 'will not be disturbed if reasonable.'" *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 928-29 (9th Cir.

2012) (citation omitted).  "This reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'"  *Id.* (citation omitted).  "The manner in which a reviewing court applies the abuse of discretion standard, however, depends on whether the administrator has a conflicting interest."  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009).  "While not altering the standard of review itself, the existence of a conflict of interest is a factor to be considered in determining whether a plan administrator has abused its discretion."  *Stephan*, 697 F.3d at 929-930 (citation omitted).  "The weight of this factor depends upon the likelihood that the conflict impacted the administrator's decisionmaking."  *Id.*

A court's review of a plan administrator's decision to terminate benefits under the abuse-of-discretion standard is limited to the administrative record.  *See Abatie*, 458 F.3d at 970 (collecting cases).  However, the court "may, in its discretion, consider evidence outside the administrative record to determine the nature, extent, and effect on the decision-making process of the conflict of interest; the decision on the merits [under the abuse of discretion standard], though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic information or otherwise."  *Id.*

### 2.      Analysis

Both sides move for judgment with respect to Plaintiff's claim to recover benefits under ERISA Section 502(a)(1)(B).  Both cross-motions are opposed.

To resolve the cross-motions, the Court first must determine how much weight to accord to Defendants' structural conflict of interest.  Then the Court must determine, while taking the conflict of interest into consideration as one factor in its determination, whether Defendants abused their discretion in terminating Plaintiff's LTD benefits as of June 28, 2019.

### a.      Weight to be accorded to the conflict of interest

The weight to be accorded to a conflict of interest "depends upon the likelihood that the conflict impacted the administrator's decisionmaking."  *Stephan*, 697 F.3d at 929.  "Where, for example, an insurer has taken active steps to reduce potential bias and to promote accuracy, the conflict may be given minimal weight in reviewing the insurer's benefits decisions.  In contrast,

1    where circumstances suggest a higher likelihood that [the conflict] affected the benefits decision,

2    the conflict should prove more important (perhaps of great importance)." *Id.* (citations and

3    quotation marks omitted, alteration in the original).  Specifically:

> The level of skepticism with which a court views a conflicted
> administrator's decision may be low if a structural conflict of
> interest is unaccompanied, for example, by any evidence of malice,
> of self-dealing, or of a parsimonious claims-granting history.  A
> court may weigh a conflict more heavily if, for example, the
> administrator provides inconsistent reasons for denial, fails
> adequately to investigate a claim or ask the plaintiff for necessary
> evidence, fails to credit a claimant's reliable evidence, or has
> repeatedly denied benefits to deserving participants by interpreting
> plan terms incorrectly or by making decisions against the weight of
> evidence in the record.

10   *Abatie*, 458 F.3d at 9768-69 (citations omitted).  These are examples of circumstances that a

11   district court may consider when determining how much weight to accord to a conflict of interest;

12   they are not exhaustive.  *See id.*  "[W]eighing a conflict of interest as a factor in abuse of

13   discretion review requires a case-by-case balance."  *Id.* at 968.  A district court may look for

14   "signs of bias" based on the facts of each case in deciding how much weight to accord to a conflict

15   of interest.  *See Montour*, 588 F.3d at 633 (internal quotation marks omitted).

16         Here, it is undisputed that Aetna Defendants operate under a structural conflict of interest

17   because they act as both the funding source for the Group Policy and as the plan administrator.

18   *See id.* at 630 (holding that, where "the same entity that funds an ERISA benefits plan also

19   evaluates claims," the plan administrator has a "structural conflict of interest: since it is also the

20   insurer, benefits are paid out of the administrator's own pocket, so by denying benefits, the

21   administrator retains money for itself").  Both sides have presented evidence outside of the

22   administrative record that bears on the question of how much weight to accord to the conflict of

23   interest.  The Court will exercise its discretion to consider that extrinsic evidence for the purpose

24   of determining the weight to be accorded to the conflict of interest.

### i.    Procedures to promote accuracy

26         Defendants argue that their conflict of interest should be given minimal weight because

27   Aetna Defendants have procedures in place to promote accuracy in their benefits determinations.

28   Defendants point to the declaration of Carol Dekshenieks, who is Aetna Defendants' corporate

United States District Court
Northern District of California

representative, which describes the various steps that Aetna Defendants take to ensure accurate claim processing and to reduce bias.  Those steps include: (1) maintaining an appeal unit that works separately from the claim department; (2) not providing analysts, managers, and appeals specialists with incentives or bonuses based in whole or in part upon the denial or termination of claims; (3) separating the claim department and appeal unit from the financial and underwriting departments; (4) retaining outside medical vendors to arrange reviews or examinations of claimants' medical conditions and records; (5) making payments to outside medical vendors in the normal course of business as compensation for services rendered; and (6) paying no compensation directly to the individual reviewing physicians employed by, retained by, or affiliated with an outside medical vendor.  *See* Dekshenieks Decl. ¶¶ 2-18, ECF No. 75-2.  Defendants also testified that they conduct audits on "a sample of files" to ensure accuracy and timeliness in claim determinations.  *See* Defs.' Rule 30(b)(6) Dep. Tr. at 173, ECF No. 75-1.

Procedures such as those described above typically warrant giving less weight to a conflict of interest, *see Stephan*, 697 F.3d at 929, but they "do not serve to wholly eliminate the existence of conflict," *see Bender v. Hartford Life Ins. Co.*, No. C 09-01163 MMC, 2011 WL 3566483, at *12 (N.D. Cal. Aug. 12, 2011).  As discussed below, however, other evidence indicates that it is likely that the conflict of interest infiltrated Defendants' administrative decision-making process, which warrants weighing the conflict more heavily notwithstanding the procedures described above.

### ii.      Inconsistencies, irregularities, and inadequate investigation

Plaintiff argues that the evidence indicates that it is likely that Aetna Defendants' determination in April 2019 and June 2019 that his disability was caused by a mental health condition and not a physical condition was motivated by their self-interest, as opposed to a desire to process his claim for LTD benefits accurately and fairly.  That determination: (1) enabled Aetna Defendants to terminate his LTD benefits based on a physical condition as of April 2019 and to continue Plaintiff's LTD benefits beyond April 2019 based on a mental health condition only; (2) permitted Aetna Defendants to condition Plaintiff's continued eligibility for LTD benefits beyond

April 2019 on his submission of proof that he was under the care of a psychiatrist under the "regular care of a physician" provision, even though Plaintiff maintained throughout the administrative process that his disability was not caused by a mental illness; and (3) enabled Defendants to apply the 24-month mental health limitation to Plaintiff's LTD benefits claim as of April 2019, which had the effect of capping his LTD benefits to 24 months beginning in April 2019. The Court agrees with Plaintiff for the following reasons.

First, the manner in which Defendants arrived at their determination that Plaintiff's disability was caused by a mental illness raises questions about whether their investigation of Plaintiff's LTD benefits claim was thorough and free of bias. Defendants relied exclusively on Dr. Allems' IME opinions to support that determination, both when they terminated Plaintiff's LTD benefits in their letters of April 2019 and June 2019, and when they denied Plaintiff's appeal in March 2020. As Plaintiff points out, Dr. Allems did not attach a disclaimer of financial conflicts to his IME report.[7] *See* AR2870-2904. The absence of such a disclaimer is notable and suggests that his opinions could have been influenced by financial considerations, because other physician consultants that were retained by third-party vendors at Defendants' request *did* include such a certification in their reports. *See, e.g.*, AR1448. Further, Dr. Allems' IME report went far beyond the scope of the matters on which he was asked to opine. The IME referral to Dr. Allems, who specializes in internal medicine and occupational medicine, was "for a disability evaluation on the basis of chronic Lyme disease and fibromyalgia." *See* AR2871. There is no indication that Dr. Allems was asked to comment on whether Plaintiff suffered from a mental illness or whether his symptoms and impairments were caused by a mental illness, or that he was asked to opine on whether Plaintiff's symptoms and impairments were caused by physical conditions other than chronic Lyme disease and fibromyalgia. Yet Dr. Allems concluded that Plaintiff's symptoms and impairments were caused by several mental illnesses and were not caused by chronic Lyme

---

[7] Defendants filed a copy of what they contend is a certification showing that Dr. Allems had no financial interest or any stake in the outcome of Plaintiff's claim. *See* ECF No. 75-1 at 109. That purported certification was not signed by Dr. Allems and is therefore immaterial to the resolution of the present motions. *See id.* Defendants have not explained why the certification is unsigned.

disease, fibromyalgia, or a variety of other physical conditions about which he was not asked to opine, including chronic inflammatory demyelinating polyneuritis, primary stabbing headache, and hereditary or idiopathic neuropathy.  *See* AR2893-2901.  Defendants have not explained the discrepancy between the scope of the referral to Dr. Allems and the various conditions he addressed in his report.

Second, Defendants have made inconsistent statements and taken inconsistent positions with respect to whether Dr. Allems diagnosed Plaintiff with a mental illness and whether they made a determination, based on Dr. Allems' report, about the extent to which a mental illness caused Plaintiff's disabilities.  That supports weighing the conflict more heavily.  *See Whealen v. Hartford Life & Acc. Ins. Co.*, No. CV06-4948PSG (PLAX), 2007 WL 1891175, at *9 (C.D. Cal. June 28, 2007), *aff'd*, 332 F. App'x 443 (9th Cir. 2009) (holding that the plan's inconsistent positions bore "negatively on the plausibility of the Hartford's stated reason for denying Whealen coverage").  Dr. Allems' IME report states that he diagnosed Plaintiff with "severe untreated psychopathology masquerading as physical illness, probable conversion disorder and profound depression[.]"  *See* AR2893 (listing these mental illnesses in his IME report under "diagnoses") (emphasis added).  His report also states that those mental illnesses were the cause of Plaintiff's physical impairments, which, according to Dr. Allems, precluded Plaintiff from sitting, standing, walking, and performing fine manipulation (e.g., typing) for more than 2.5 hours in an eight-hour workday.  AR2903-04.  Dr. Allems made those diagnoses without conducting any tests to determine whether Plaintiff suffered from a mental illness or to determine the severity of any mental illness.[8]  Given that Dr. Allems specializes in internal medicine and occupational medicine, Defendants stated in their internal claim notes that Dr. Allems "may not be the ideal physician to comment on mental health" and that ideally it would be a "psychiatrist or psychologist to comment on severity of depression and conversion disorder."  AR258.  Despite those apparent reservations, Defendants relied exclusively on Dr. Allems' IME report to support their

---

[8] *See* Defs.' Rule 30(b)(6) Dep. Tr. at 102-03 (admitting that there are "standard tests" that are "completed to determine if someone is depressed" and that Dr. Allems did not conduct any test for depression).

determinations in the April 2019 letter that Plaintiff was totally disabled from any reasonable occupation because of a mental illness and not a physical condition[9]; that he was required to submit proof that he was under the care of a psychiatrist under the "regular care of a physician" provision; and that his LTD claim was subject to the 24-month mental health limitation, which applies where a disability is caused "primarily" by a mental health condition.  Those April 2019 determinations imply that Defendants accepted and relied upon Dr. Allems' diagnoses of "untreated psychopathology masquerading as physical illness, probable conversion disorder, and profound depression," as well as Dr. Allems' opinion that those conditions were "primarily" (if not exclusively) causing Plaintiff's disability.

However, during their Rule 30(b)(6) deposition, Aetna Defendants took the position that Dr. Allems "did not diagnose anything."  *See* Defs.' Rule 30(b)(6) Dep. Tr. at 79.  Defendants do not explain how, if Dr. Allems "did not diagnose anything," his IME report could support their determination in the April 2019 letter, based exclusively on Dr. Allems' IME report, that Plaintiff was totally disabled from any reasonable occupation because of a mental illness and that, as a result, he was required to submit proof that he was under the care of a psychiatrist based on the "regular care of a physician" provision of the Group Policy.  That provision specifically requires a *diagnosis* of a mental health or psychiatric illness that is causing the claimant's disability to some extent.  *See* AR3182 (Group Policy providing that, to remain eligible for LTD benefits, a claimant must be under the "regular care of a physician" for the "*illness*, injury, or pregnancy-related condition that caused the disability") (emphasis added); AR3201 (Group Policy defining "illness" as a "pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to the findings [that] set the condition apart as an abnormal entity differing from other normal or pathological body states"); AR3202 (providing that, to remain

---

[9] In their briefs, Defendants argue that they told Plaintiff in the April 2019 letter that he did *not* meet the test of disability under the Group Policy.  *See* ECF No. 64 at 18; ECF No. 75 at 12.  This is inconsistent with the April 2019 letter, which provides that Plaintiff *did* meet the test of disability based on a mental health condition.  *See* AR2861, AR2863 ("you do meet this definition of being totally disabled from any gainful occupation at this time . . . due to a mental health condition which is limited to 24 months of benefits").  This inconsistency also supports weighing the conflict of interest more heavily.

United States District Court
Northern District of California

1    eligible for LTD benefits, a claimant must show that he is being attended by a physician who

2    specializes in psychiatry and whose treatment is "[c]onsistent *with the diagnosis of the disabling*

3    *condition*" if the claimant's "disability is caused, to any extent, by a mental health or psychiatric

4    condition") (emphasis added).  Aetna Defendants' deposition testimony suggests that Dr. Allems'

5    opinions were not a sufficient basis for them to state in the April 2019 letter that Plaintiff was

6    required to submit proof that he was under the care of a psychiatrist under the "regular care of a

7    physician" provision.  That raises significant questions about whether Aetna Defendants' handling

8    of Plaintiff's LTD benefits claim was motivated by financial self-interest given that Plaintiff's

9    LTD benefits were terminated as of June 28, 2019, in part because he failed to submit proof that

10   he was under the care of a psychiatrist under the "regular care of a physician" provision.

11        The inconsistencies do not end there.  Defendants testified that they never applied the 24-

12   month mental health limitation to Plaintiff's claim because they never determined that Plaintiff's

13   disability was "primarily" caused by a mental health condition.  *See* Defs.' Rule 30(b)(6) Dep. Tr.

14   at 124-25; *see also id.* at 96-97.[10]  However, as discussed above, the April 2019 letter states that

15   Defendants had determined, based on Dr. Allems IME report alone, that Plaintiff was totally

16   disabled from any reasonable occupation and that Plaintiff's LTD benefits would continue beyond

17   April 2019 subject to the 24-month mental health limitation, which applies where a disability is

18   "primarily" caused by a mental health condition.  *See* AR2861 (April 2019 letter stating that

19   Plaintiff's LTD claim "will continue" under the 24-month limitation and that the "24 month period

20   will begin as of the date of this letter, April 26, 2019").  Defendants do not explain the

21

22   ───────────────
     [10] *See* Defs.' Rule 30(b)(6) Dep. Tr. at 96-97 ("A: They never communicated anything to him that
23   mental was primary [cause of his disability]. . . . Q. Didn't they send him a letter saying that the
     two-year mental nervous limitation apply [sic]?  A. They did not apply the limitation.  They just
24   referenced that there is such in the policy.  Q. When they referenced that didn't they say that his
     benefits would be terminated after two years from the date of the letter?  A. They did not say they
25   were.  They said they could be.  They were commenting on the terms of what was in the policy. . .
     . Q: The question was as you sit here today did Aetna and/or Hartford ever make a determination
26   that Mr. Ehrlich's primary condition was not a physical condition?  No.").  That testimony
     contradicts Defendants' statements in the April 2019 letter, *see* AR2861, and their arguments in
27   this litigation before they were deposed, *see, e.g.*, ECF No. 66 at 5 (arguing that Dr. Allems
     opined that Plaintiff's "self-reported limitations stemmed from depression" and that "Aetna was
28   thus compelled to conclude that . . . any disability was subject to the Group Policy's 24-month
     mental illness limitation").

inconsistency between their deposition testimony and the April 2019 letter. Defendants' attempt to downplay their statements in the April 2019 letter suggests an implicit acknowledgement that Dr. Allems' opinions were not a sufficient basis for Defendants to apply the 24-month mental health limitation to Plaintiff's LTD benefits claim as of April 2019. Given that applying the 24-month mental health limitation to Plaintiff's claim was in Defendants' financial self-interest, this further suggests that Defendants' handling of Plaintiff's claim may have been impacted by their conflict of interest.

Third, Defendants' deposition testimony suggests that it was unusual for Aetna Defendants to have treated Plaintiff's claim for LTD benefits as being premised on a disability caused by a mental health condition after receiving Dr. Allems' IME. Plaintiff applied for LTD benefits based on a variety of physical conditions that included fibromyalgia, headache, chronic pain, neuropathies, polyneuropathy, and bacterial infections; he did not apply for LTD benefits based on a mental health condition. *See* AR2829; AR722. Aetna Defendants testified that, prior to receiving Dr. Allems' IME report, they considered Plaintiff's primary condition to be a physical one. *See* Defs.' Rule 30(b)(6) Dep. Tr. at 95. Aetna Defendants paid Plaintiff LTD benefits based on his claimed physical conditions from April 2017 until they received Dr. Allems' IME report in April 2019. Defendants have not pointed to any provision in the Group Policy, or to any other authority, that permits them to treat Plaintiff's LTD benefits claim as one being based on a mental health condition even though Plaintiff never applied for LTD benefits based on a mental health condition. During their deposition, Defendants were asked whether they were aware of any other instance in which a claimant had applied for LTD benefits based on a physical condition and the condition was later changed by the plan administrator to a mental health condition, as Defendants did with Plaintiff's claim, and they responded that they were not aware of any such instance. *See* Rule 30(b)(6) Dep. Tr. at 172. The atypical manner in which Defendants handled Plaintiff's LTD benefits claim after receiving Dr. Allems' IME report further suggests that Defendants' handling of Plaintiff's claim could have been motivated by their self-interest.

Fourth, for the purpose of resolving Plaintiff's appeal of their determination that his disability was caused by a mental health condition, Aetna Defendants did not consult with a

United States District Court
Northern District of California

different physician on that issue as required by ERISA regulations, which provide that a fiduciary deciding an appeal must consult with a different medical professional who was not consulted in connection with the initial adverse benefit determination.  *See* 29 C.F.R. § 2560.503-1(h)(3)(ii)-(v).[11]  The only medical evidence that Defendants discussed in the March 2020 final denial letter that had anything to do with whether Plaintiff's impairments were caused by a mental illness was Dr. Allems' IME report.[12]  That Defendants relied exclusively on Dr. Allems' IME report for a second time in denying Plaintiff's appeal indicates a failure to take steps to ensure a fair and accurate determination of Plaintiff's LTD benefits claim, which supports weighing the conflict of interest more heavily.[13]  *See Sereno v. VPA, Inc.*, No. 2:03-CV-2095-HRH, 2009 WL 10707322, at *13 (D. Ariz. Aug. 31, 2009) (finding that the plan administrator's "reliance on the same IME throughout the claims process," including in terminating the claimant's benefits and in denying her appeal, constituted "evidence that active steps were not taken to promote the accuracy of the benefits decision" and supported weighing the plan administrator's conflict of interest more heavily).

Fifth, Aetna Defendants' reliance on Dr. Hoenig and Dr. Polanco's opinions to uphold their termination of Plaintiff's LTD benefits and their determination that Plaintiff was not disabled in the March 2020 final denial letter also raises questions about the adequacy and impartiality of their investigation.  Dr. Hoenig (pain medicine) and Dr. Polanco (occupational medicine) both

---

[11] Sections 2560.503-1(h)(3)(ii)-(v) apply to group health plans.  However, Section 2560.503-1(h)(4) makes those sections applicable to disability benefit plans, as well.

[12] Defendants sought peer reviews by two physicians for the purpose of resolving Plaintiff's appeal (Dr. Hoenig, pain medicine, and Dr. Polanco, occupational medicine), but neither of them was asked to opine on whether Plaintiff's impairments were caused by a mental illness.

[13] Defendants contend that the Court may infer that their conflict of interest did not impact their processing of Plaintiff's LTD benefits claim because, in August 2018, they overturned their January 2018 termination of Plaintiff's LTD benefits.  *See* ECF No. 75 at 20.  The Court is not persuaded,  for two reasons.  First, the January 2018 termination of Plaintiff's LTD benefits is not at issue in this action.  Second, the record indicates that, for the purpose of reviewing Plaintiff's appeal of the January 2018 termination, Defendants consulted with a new medical professional, Dr. Stauber, as required by ERISA regulations.  Defendants did not do the same with respect to Plaintiff's appeal of the June 2019 termination of Plaintiff's LTD benefits; as discussed above, Defendants did not consult with a different medical professional about whether Plaintiff's impairments were caused by a mental illness.

United States District Court
Northern District of California

conducted a paper review of Plaintiff's medical records and concluded that Plaintiff was not

functionally impaired because of a physical condition and could work full time for the time period

covered by their reports, which was June 28, 2019, to December 2019 and February 2020.  The

record suggests that Dr. Hoenig and Dr. Polanco's opinions may have been improperly influenced

in favor of finding that Plaintiff was not disabled.  Aetna Defendants provided Dr. Hoenig and Dr.

Polanco with the reports of other peer reviewers who concluded that Plaintiff was capable of

working full time (i.e., the reports of Dr. Ash, Dr. Crossley, and Dr. Sims), *see* AR722, AR709,

but they did *not* provide them with the report of Dr. Stauber, who concluded that Plaintiff was *not*

capable of working full time, *see* Defs.' Rule 30(b)(6) Dep. Tr. at 156 (testifying that Dr.

Stauber's report was not provided to Dr. Hoenig and Dr. Polanco).  Aetna Defendants' selective

sharing of peer review reports with Dr. Hoenig and Dr. Polanco was contrary to Aetna

Defendants' policy for ensuring that peer reviews are independent,[14] which suggests a motivation

to generate medical evidence to support a finding that Plaintiff was not disabled.  *See* Defs.' Rule

30(b)(6) Dep. Tr. at 41-42 (testifying that their policy is to not "share peer reviews with other peer

reviewers" so that peer reviewers are "completely independent").

The fact that Aetna Defendants did not require any peer reviewer to conduct an in-person

examination of Plaintiff's functional limitations for the purpose of resolving his appeal also

suggests that Defendants may have been looking for reasons to support a finding that Plaintiff was

not disabled.  Defendants were aware that other physicians who observed Plaintiff, either in person

or by video, had concluded that Plaintiff had significant physical impairments that would preclude

him from sitting and typing for significant periods of time.  For example, Dr. Allems concluded

that Plaintiff could not sit, stand, walk, or perform fine manipulation for more than 2.5 hours in a

workday after conducting an in-person physical assessment of Plaintiff.  AR2903.  As another

example, Dr. Stauber concluded, after watching videos of Plaintiff, that he would have significant

difficulty performing a task requiring typing on a keyboard or standing for any length of time and

---

[14] *See* Defs.' Rule 30(b)(6) Dep. Tr. at 41-42 (testifying that their policy is to not "share peer
reviews with other peer reviewers" so that peer reviewers are "completely independent").

1   that Plaintiff therefore did not have "full time functionality."  AR1344.  Given that visual evidence

2   of Plaintiff's impairments previously led to opinions that supported a finding of disability, Aetna

3   Defendants' choice to rely on paper reviews alone for the purpose of determining Plaintiff's

4   functional impairments to resolve his appeal suggests that their investigation of Plaintiff's

5   functional impairments was inadequate and perhaps intentionally so.[15]

6          The foregoing supports weighing the conflict of interest more heavily.

7                    **iii.      Failure to ask Plaintiff for necessary evidence**

8          A conflict of interest may be weighed more heavily if the administrator failed to ask the

9   plaintiff for necessary evidence.  *See Abatie*, 458 F.3d at 968-69.  "[I]f the administrator believes

10  more information is needed to make a reasoned decision, they must ask for it."  *Booton v.*

11  *Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).  A plan administrator fails to

12  comply with this requirement if it notifies the claimant of missing information for the first time in

13  its final denial letter.  *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863,

14  871 (9th Cir. 2008) (holding that plan administrator failed to notify the plaintiff as to what she

15  needed to submit to perfect her claim because it informed her of a deficiency in its "final denial"

16  letter, which was "too late to do [the plaintiff] any good").

17         The March 2020 final denial letter stated that Plaintiff "did not meet definition of

18  disability, as defined by the Plan, from an illness or injury that would have prevented your client

19  from performing any reasonable occupation *due to lack of medical evidence* to support a physical

20  impairment."  AR3043.  However, Aetna Defendants did not provide Plaintiff with a description

21  of additional information he could have submitted to perfect his claim for LTD benefits based on a

22  physical condition before they denied his appeal.  Aetna Defendants stated in their June 2019 letter

23  that their claim processing guidelines permit them to terminate a claim for benefits if they request

24  information from the claimant that they need to determine ongoing disability, the claimant "is

---

[15] Notably, Plaintiff submitted videos of his hand tremors in support of his appeal, but Aetna Defendants did not consider them because they deemed them to be unauthenticated.  *See* AR348. There is no indication in the record that Aetna Defendants notified Plaintiff of the authentication deficiency so that he could cure it before they issued the March 2020 final denial letter.

United States District Court
Northern District of California

aware of what information is needed," and the claimant fails to submit he information "after at least two (2) follow ups."  AR2918.  Yet, neither the April 2019 letter nor the June 2019 letter specified the information that Plaintiff needed to submit to perfect his LTD benefits claim based on a disability caused by a physical condition.[16]  This supports weighing the conflict of interest more heavily.

**iv.    Failure to credit Plaintiff's reliable evidence**

As noted, conflict of interest may be weighed more heavily if the administrator fails to credit a plaintiff's reliable evidence.  *See Abatie*, 458 F.3d at 9768-69.

As discussed in detail in the next section of this order, Defendants failed to credit Plaintiff's reliable evidence that his physical conditions preclude him from performing any occupation, and that his depression is a symptom of his fibromyalgia and is not a cause of his disability.  That supports giving more weight to the conflict of interest.  *See Stephan*, 697 F.3d at 938 (noting that an apparent "failure to give any weight to" evidence that supported an award of benefits could "indicate" that the plan administrator "failed to take into account relevant evidence, supporting the conclusion that its decisionmaking was affected by a conflict of interest").

**v.    Conclusion as to weight of conflict of interest**

Based on the foregoing, the Court finds that the relevant evidence suggests that it is likely that, despite the procedures to reduce bias that Aetna Defendants have in place, the conflict of interest infiltrated their administrative decision-making process with respect to Plaintiffs' claim for LTD benefits.  Accordingly, the Court will accord moderate weight to the conflict of interest and will review Defendants' denial of Plaintiffs' LTD benefits claim with a moderate degree of skepticism.

**b.    Whether Aetna Defendants abused their discretion**

A plan administrator abuses its discretion if a court is "left with a definite and firm

---

[16] As discussed in more detail in the next section of this order, the June 2019 letter invited Plaintiff to submit any additional information he "care[d] to submit," and provided general examples of such information, but that was not sufficient to inform Plaintiff of what information he needed to submit to perfect his LTD benefits claim based on a physical condition.

United States District Court
Northern District of California

1    conviction that a mistake has been committed[.]"  *Salomaa*, 642 F.3d at 675-76 (citation and

2    internal quotation marks omitted).  To determine whether a plan administrator abused its

3    discretion, courts consider whether the plan administrator's determination was "(1) illogical, (2)

4    implausible, or (3) without support in inferences that may be drawn from the facts in the record."

5    *See id*.  In reviewing the reasonableness of a plan administrator's decision, a court may look to a

6    variety of factors, including:

> the quality and quantity of the medical evidence, whether the plan
> administrator subjected the claimant to an in-person medical
> evaluation or relied instead on a paper review of the claimant's
> existing medical records, whether the administrator provided its
> independent experts "with all of the relevant evidence," and
> whether the administrator considered a contrary SSA disability
> determination, if any.

11   *Montour*, 588 F.3d at 630 (citation omitted).[17]

12        Here, after carefully reviewing the administrative record with a moderate degree of

13   skepticism in light of Aetna Defendant's conflict of interest, the Court is left with a definite and

14   firm conviction that a mistake was committed when Defendants terminated Plaintiff's LTD

15   benefits as of June 28, 2019.

16                     **i.      Failure to provide a full and fair review**

17        A plan administrator must provide a claimant a "full and fair review" of an adverse

18   benefits determination.  *See Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1185

19   (9th Cir. 2022) (citing 29 U.S.C. § 1133(2)).  A plan administrator abuses its discretion if its

20   decision "fails the 'fair review' requirement of the statute."  *See Jordan v. Northrop Grumman*

21   *Corp. Welfare Benefit Plan*, 370 F.3d 869, 879 (9th Cir. 2004), *overruled on other grounds by*

22   *Abatie*, 458 F.3d at 969.

23

24   _____

25   [17] Defendants argue that the Court must affirm their termination of Plaintiff's LTD benefits if the decision is grounded "on any reasonable basis."  *See* ECF No. 76 at 6.  However, the "any reasonable basis" test "is no longer good law when as in this case an administrator operates under

26   a structural conflict of interest."  *Salomaa*, 642 F.3d at 673-74.  Where, as here, a plan administrator operates under a conflict of interest, "[s]imply construing the terms of the underlying

27   plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of

28   interest as a factor in the analysis."  *Montour*, 588 F.3d at 630.

United States District Court
Northern District of California

United States District Court
Northern District of California

A "full and fair" review requires the plan administrator to disclose to the claimant, in its initial benefits determination, the specific reasons and rationale for its denial or termination of benefits, written in a manner calculated to be understood by the claimant. *See* 29 U.S.C. § 1132. This requirement is intended to "afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial" during an administrative appeal of the adverse benefits determination. *See Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010) (citation and internal quotation marks omitted). If a plan administrator fails to disclose a reason or rationale for the denial or termination of benefits, then it may not rely on that reason or rationale in litigation. *See Collier*, 53 F.4th at 1186 (holding that, if an administrator advances a new rationale or argument for denying benefits after the administrative process has ended, the administrator violates ERISA's requirement that it conduct a "full and fair review" of the plaintiff's claim and the district court may not rely on that new rationale or argument for the purpose of determining a claim for benefits under ERISA); *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Illinois*, 983 F.3d 435, 440-42 (9th Cir. 2020) ("When making a claim determination under ERISA, an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court.") (citation and internal quotation marks omitted).

If a claimant appeals an adverse benefits determination, a plan administrator is required to review at the administrative level the "specific reasons" it provided for the denial or termination of benefits. *See Saffon*, 522 F.3d at 871 ("By requiring that an administrator notify a claimant of the reasons for the administrator's decisions, the [ERISA] statute suggests that the specific reasons provided must be reviewed at the administrative level.") (citation and internal quotation marks omitted). For the purpose of resolving the appeal, the plan administrator is required to take into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial adverse benefit determination, 29 C.F.R. § 2560.503-1(h)(2)(iv); to "[p]rovide for a review that does not afford deference to the initial adverse benefit determination," *id.* § 2560.503-

1(h)(3)(ii); and to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment" that formed the basis of the initial adverse benefit determination when "deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment," *id.* § 2560.503-1(h)(3)(iii).[18]   The health care professional consulted for the purpose of the appeal must be "neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual[.]" *Id.* § 2560.503-1(h)(3)(v).  A failure to comply with these procedural requirements weighs against the reasonableness of a plan administrator's benefits determination.  *See Abatie*, 458 F.3d at 972.

As noted, in the April 2019 letter, Aetna Defendants informed Plaintiff that, based on Dr. Allems' IME report and findings that Plaintiff could not sit, stand, walk, or perform fine manipulation for more than 2.5 hours in a workday, he was totally disabled from any reasonable occupation because of a mental health condition and not a physical condition.  Aetna Defendants further determined based on Dr. Allems' IME report that Plaintiff was required to submit proof within 60 days that he was under the care of a physician who specialized in psychiatry under the "regular care of a physician" provision of the Group Policy.  In their June 2019 letter, Aetna Defendants terminated Plaintiff's LTD benefits (1) based on a mental health condition because he failed to submit proof that he was under the care of a physician who specialized in psychiatry pursuant to the "regular care of a physician" provision; and (2) based on a physical condition because they concluded based on Dr. Allems' IME report that Plaintiff was not totally disabled from any reasonable occupation due to a physical condition.  *See* AR2916-17.  Plaintiff appealed those determinations.  *See* AR799-811.

Because Aetna Defendants' termination of Plaintiff's LTD benefits as of June 2019 was based at least in part on Dr. Allems' medical judgment that Plaintiff's impairments were caused by a mental illness, Aetna Defendants were required, for the purpose of resolving Plaintiff's appeal,

---

[18] Sections 2560.503-1(h)(2)(ii) through (iv) and (h)(3)(ii) through (v) apply to disability benefit plans pursuant to Section 2560.503-1(h)(4).

to consult with a different medical professional regarding that medical judgment.  *See* 29 C.F.R. § 2560.503-1(h)(3)(ii)-(v).  However, the only medical opinion that Aetna Defendants cited in the March 2020 final denial letter that had anything to do with whether Plaintiff's impairments were caused by a mental health condition was Dr. Allems' IME report.  By relying on Dr. Allems' opinions for a second time to resolve Plaintiff's appeal, Aetna Defendants failed to provide Plaintiff with a full and fair review of his appeal; that supports a finding that Defendants abused their discretion in terminating Plaintiff's LTD benefits as of June 28, 2019.  *See Pitts v. Prudential Ins. Co. of Am.*, 534 F. Supp. 2d 779, 791 (S.D. Ohio 2008) (holding that one of "the most fundamental of procedural defects" that deprives a claimant of a full and fair review is where "an insurer, with the conflict of interest of being both the adjudicator and payer of benefits, bas[es] its decision on the opinion of its hired health care professional during the initial review and on appeal"); *see also Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1042 (9th Cir. 2014) (holding that a plan administrator abuses its discretion if it "fails to develop facts necessary to its determination") (citation and internal quotation marks omitted).  The effect of Aetna Defendants' failure to consult with a second medical professional about whether Plaintiff's impairments were caused by a mental illness means that the opinions of Plaintiff's treating physicians that Plaintiff's impairments and inability to work were *not* caused by a mental illness were not controverted by any reliable evidence supporting the opposite conclusion, as will be discussed in more detail below.

Defendants argue that it is not the case that they failed to provide Plaintiff with a "full and fair" review of his appeal because there "was no appeal as of June 28, 2019" given that "Hartford had paid the claim in full up to that date."  *See* ECF No. 76 at 15.  This argument is unavailing.  There did not need to be an appeal as of June 28, 2019.  On June 28, 2019, Defendants issued the adverse benefit determination that terminated Plaintiff's LTD benefits based on a mental health condition and that reaffirmed their April 26, 2019, termination of his LTD benefits based on a physical condition.  Under ERISA regulations and Aetna Defendants' own appeal procedures, Plaintiff had 180 days from that date to file an appeal.  The record shows that Plaintiff filed an appeal within the 180-day period.  *See* AR292; AR2923-30; AR799-811.

1    Defendants also argue that, because Plaintiff failed to submit proof that he was under the

2  care of a physician who specialized in psychiatry pursuant to the "regular care of a physician"

3  provision, the Court may affirm their termination of Plaintiff's LTD benefits as of June 28, 2019,

4  notwithstanding Plaintiff's arguments that Aetna Defendants failed to provide him with a full and

5  fair review.  *See, e.g.*, ECF No. 75 at 20; ECF No. 76 at 5.  The Court is not persuaded.  As

6  discussed above, Plaintiff appealed Aetna Defendants' determination, based on Dr. Allems'

7  medical judgment, that his impairments and disability were caused by a mental illness and that he

8  was therefore required to submit proof that he was under the care of a psychiatrist.  Aetna

9  Defendants were required, but failed, to review that determination on appeal by seeking a new

10  medical opinion on whether Plaintiff's impairments and disability were caused by a mental illness.

11  Defendants have cited no authority that a court may affirm a termination of benefits that was based

12  on a determination that was appealed but was not reviewed in accordance with ERISA regulations.

13    Relatedly, Defendants argue that, because the SSA's opinion awarding Plaintiff disability

14  benefits and the evidence discussed therein show that Plaintiff's inability to work was caused to

15  some extent by a mental illness, the Court may find that Aetna Defendants did not abuse their

16  discretion in terminating Plaintiff's LTD benefits for failure to submit proof that he was under the

17  care of a psychiatrist under the "regular care of a physician" provision.  *See* ECF No. 75 at 20.

18  This argument also fails.  Because Defendants did not point to the SSA's opinion awarding

19  benefits or the evidence cited therein as a rationale for their termination of Plaintiff's LTD benefits

20  in any of the relevant denial letters, Defendants cannot rely on that rationale in this litigation.[19]

21  *See Beverly Oaks*, 983 F.3d at 440-42 ("When making a claim determination under ERISA, an

22  administrator may not hold in reserve a known or reasonably knowable reason for denying a

23

24    ────────────────

25  [19] The SSA's opinion is not consistent with the rationales that Aetna Defendants advanced for
terminating Plaintiff's LTD benefits in any event.  The SSA did not find that Plaintiff's *physical*
impairments were caused by a mental illness, as Dr. Allems and Aetna Defendants concluded.
26  Instead, the SSA found that Plaintiff suffered from depression secondary to his fibromyalgia,
which caused Plaintiff to experience *cognitive* difficulties that impacted his ability to work.
27  AR874-75.  Defendants did not make any determination in support of their termination of
Plaintiff's LTD benefits that Plaintiff's disability was caused by *cognitive* difficulties that were
28  due to depression or any other mental illness.

United States District Court
Northern District of California

1    claim, and give that reason for the first time when the claimant challenges a benefits denial in

2    court.") (citation and internal quotation marks omitted).

3                    **ii.        Failure to credit Plaintiff's reliable evidence**

4            "[P]lan administrators are not obliged to accord special deference to the opinions of

5    treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  A

6    treating physician's opinion "can be rejected on the basis of reliable evidence with no discrete

7    burden of explanation." *Jordan,* 370 F.3d at 879.  However, "[i]n refusing a claimant's reliable

8    evidence, the plan administrator should themselves be 'credit[ing] reliable evidence that conflicts

9    with a treating physician's evaluation.'" *See Farhat v. Hartford Life & Acc. Ins. Co*., 439 F. Supp.

10   2d 957, 973 (N.D. Cal. 2006) (Hamilton, J.).  A plan administrator's failure to point to reliable

11   contrary evidence when rejecting a treating physician's opinion is an abuse of discretion.  *See id.*;

12   *see also James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 874 (N.D. Cal.

13   2014) (Orrick, J.) (same).

14           Here, Aetna Defendants abused their discretion by failing to credit the opinions of

15   Plaintiff's treating physicians that Plaintiff was disabled because of fibromyalgia, autoimmune

16   autonomic neuropathy, and inflammatory polyneuropathy, and that his disability was not caused

17   by a mental illness, without pointing to reliable evidence that contradicted those opinions.[20]

18           **Fibromyalgia.**  Plaintiff submitted records in support of his LTD benefits claim showing

19   that (1) Dr. Davis, a rheumatologist, diagnosed Plaintiff with fibromyalgia in 2014 and noted that

20   fibromyalgia "would account for [Plaintiff's] chronic pain and reproducible tender spots," AR953;

21   and that (2) Dr. Congdon, who has treated Plaintiff for fibromyalgia since 2017, opined that

22   Plaintiff is unable to perform the duties of his occupation or any occupation because of

23   fibromyalgia, AR788.

24

25   ─────────────────

26   [20] Because the Court's finding that Aetna Defendants abused their discretion by failing to credit
     Plaintiff's reliable evidence with respect to the physical conditions described above suffices for
     the purpose of resolving the present motions, the Court need not consider whether Aetna
27   Defendants also erred in failing to credit Plaintiff's reliable evidence of disability due to other
     physical conditions based on which he claimed LTD benefits, such as bacterial infections or
28   persistent Lyme disease.

United States District Court
Northern District of California

1      In terminating Plaintiff's LTD benefits and in upholding the termination, Aetna

2 Defendants failed to credit those opinions[21] without citing to reliable evidence that supported their

3 contrary determination that Plaintiff was *not* disabled because of fibromyalgia.  In concluding that

4 Plaintiff was not disabled due to fibromyalgia, Defendants relied on Dr. Allems' IME report and

5 the opinions of Dr. Hoenig and Dr. Polanco.[22]  However, for the reasons discussed below, the

6 opinions of Dr. Allems, Dr. Hoenig, and Dr. Polanco on that issue were unsupported or

7 impermissibly required objective evidence that does not exist.

8      Dr. Allems acknowledged that Plaintiff was diagnosed with fibromyalgia by Dr. Davis and

9 treated for the condition by Dr. Congdon, *see* AR2872; that fibromyalgia is a "functional disorder

10 based exclusively on subjective reports of widespread pain complaints and nonrestorative sleep,"

11 AR2893; and that Plaintiff suffered from "diffuse body pain and migratory paresthesias

12 (tingling/numbness)," which Plaintiff claimed restricted him physically and precluded him from

13

14 [21] Defendants argue that they correctly declined to defer to the opinions of Plaintiff's physicians

15 (whom Defendants do not identify by name) because they "practiced the bounds of science based medicine."  *See* ECF No. 76 at 5.  Defendants did not advance that rationale in any of the

16 relevant denial letters and, therefore, they cannot rely on it in this litigation.  *See Beverly Oaks*, 983 F.3d at 440-42.  The Court finds that, to the extent that Aetna Defendants were inclined to

17 reject or not consider the opinions of any of Plaintiff's treating physicians on the basis that they practiced "outside the bounds of science based medicine," they were required to have a

18 meaningful dialogue with Plaintiff with respect to that issue during the administrative process so that Plaintiff could have an opportunity to cure the defect and perfect his claim, such as by

19 soliciting the opinions of other physicians.  *See Saffon*, 522 F.3d at 870.  Defendants have not pointed to any communication with Plaintiff during the administrative process in connection with

20 the termination of benefits at issue in which they notified him that they would not consider or would discount the opinions of Plaintiff's treating physicians on the basis that they practiced

21 "outside the bounds of science based medicine."

22 [22] Defendants argue that they relied on the opinions of Dr. Sims, Dr. Ash, and Dr. Crossley to support their determination that Plaintiff was not disabled from working full-time due to a

23 physical condition, and in rejecting the contrary opinions of Plaintiff's treating physicians.  *See* ECF No. 75 at 18.  However, Aetna Defendants did not cite the opinions of Dr. Sims, Dr. Ash, and

24 Dr. Crossly in any of the relevant denial letters as rationales for the termination of Plaintiff's LTD benefits as of June 28, 2019 (i.e., the April 2019, June 2019, and March 2020 letters).  Defendants

25 have not pointed to any other communication with Plaintiff in which Aetna Defendants informed him that they had considered or relied on the opinions of Dr. Sims, Dr. Ash, and Dr. Crossley in

26 connection with their termination of Plaintiff's benefits as of June 28, 2019.  Accordingly, Defendants may not rely on those opinions in this litigation.  *See Beverly Oaks*, 983 F.3d at 440-

27 42; *see also See* 29 C.F.R. § 2560.503-1(h)(3)(iv) (requiring plans, in connection with an appeal of an adverse benefit determination, to identify medical or vocational experts whose advice was

28 obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination).

United States District Court
Northern District of California

working, AR2893.  Although Dr. Allems found that Plaintiff could not sit, walk, stand, or perform fine manipulation for more than 2.5 hours in a workday, AR2903-04, he did not attribute those impairments to fibromyalgia and concluded that Plaintiff was not disabled because of fibromyalgia, AR2893.  Dr. Allems provided no explanation for that conclusion, which is notable given that the referral to him was for "a disability evaluation on the basis of chronic Lyme disease and fibromyalgia."  *See* AR2871.  Given the lack of any analysis in Dr. Allems' IME report to support his conclusion that Plaintiff's impairments were not caused by fibromyalgia and that Plaintiff was not disabled because of fibromyalgia, Aetna Defendants' reliance on Dr. Allems' report to support their determination Plaintiff was not disabled due to fibromyalgia was arbitrary and capricious.  *See Whealen*, 2007 WL 1891175, at *13 (holding that a plan administrator's reliance on "reports that lacked a complete analysis" of matters that impacted the determination of whether the plaintiff was disabled was "both arbitrary and capricious"); *James*, 41 F. Supp. 3d at 875 (same where the plan relied on opinions of physician who "d[id] not explain how he reached any of [his] conclusions").

Dr. Hoenig acknowledged in his initial report that Dr. Congdon had opined that Plaintiff was unable to perform any occupation solely because of fibromyalgia.  AR722.  In the addendum to his initial report, Dr. Hoenig also acknowledged that Plaintiff's pain complaints had been "ongoing" and "presented consistently throughout the course of treatment," and that Plaintiff "reported having affected pain across his body that includes difficulty with sitting, standing, walking, and typing." AR479-82.  Yet, Dr. Hoenig concluded, from a "pain medicine perspective," that the medical records did not "support this as causing functional impairment from June 28, 2019 to the present."  AR482.  Dr. Hoenig's only explanation for that conclusion was that Plaintiff's "symptoms and complaints [were] not clearly explained by the medical findings," and that there was "no documentation of any significantly abnormal, clear, pathology on exam" or "documentation of any clear significantly abnormal diagnostic study submitted for review."  *See id.*

Dr. Hoenig's report suggests that he did not credit Plaintiff's complaints of pain and that he required objective evidence that Plaintiff's reported pain was caused by fibromyalgia.

43

However, the Ninth Circuit has held that fibromyalgia, which is a physical disease, is not "established through objective tests or evidence." *See, e.g.*, *Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625*, 856 F.3d 686, 696 (9th Cir. 2017); *Jordan*, 370 F.3d at 872-73 (holding that "fibromyalgia as a physical rather than a mental disease" and that "fibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. . . . Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia.") (footnote omitted). By relying on Dr. Hoenig's opinions in upholding their termination of Plaintiff's LTD benefits, Aetna Defendants effectively required objective evidence of the pain that Plaintiff reported as impairing his ability to sit, walk, stand, and type, as well as objective evidence that any such pain was caused by fibromyalgia. Because that objective evidence does not exist, Aetna Defendants abused their discretion. *See Minton v. Deloitte & Touche USA LLP Plan*, 631 F. Supp. 2d 1213, 1220 (N.D. Cal. 2009) (Wilken, J.) (holding that plan administrator abused its discretion by relying on report by physician who "rendered his opinion based on a lack of evidence that one would not expect to find in the first place" and noting that "[b]y effectively requiring 'objective' evidence for a disease that eludes such measurement" the plan administrator "established a threshold that can never be met by claimants who suffer from fibromyalgia or similar syndromes, no matter how disabling the pain") (citation omitted); *see also Salomaa*, 642 F.3d at 678 (holding that "conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious"); *Montour*, 588 F.3d at 634-35 (indicating that a plan should not require a claimant to provide objective proof of his pain level and that a plan should not reject subjective claims of excess pain based solely on a paper review's observation that a physical impairment should not cause the claimant as much pain as he was reportedly suffering).

Dr. Polanco noted in his initial report that Plaintiff had been diagnosed with fibromyalgia, AR709-710, and that Plaintiff complained of chronic pain throughout his body, AR717. Yet, he concluded that there were "no clear clinical findings to support a diagnosis of fibromyalgia." AR717. Dr. Polanco did not explain why he believed that there were no "clear clinical findings"

to support a diagnosis of fibromyalgia or explain what "clinical findings" he believed were necessary to support a diagnosis of fibromyalgia. Dr. Polanco did not acknowledge, and thus appears not to have considered, Dr. Davis' 2014 fibromyalgia diagnosis and notes that fibromyalgia "would account for [Plaintiff's] chronic pain and reproducible tender spots." AR953. Given the lack of any analysis in Dr. Polanco's report to support his conclusion Plaintiff did not suffer from fibromyalgia, Defendants' reliance on Dr. Polanco's report to support their determination Plaintiff was not disabled due to fibromyalgia was arbitrary and capricious. *See Whealen*, 2007 WL 1891175, at *13 (holding that a plan administrator's reliance on "reports that lacked a complete analysis" of matters that impacted the determination of whether the plaintiff was disabled was "both arbitrary and capricious"); *James*, 41 F. Supp. 3d at 875 (same where the plan relied on opinions of physician who "d[id] not explain how he reached any of [his] conclusions").

Because the opinions of Dr. Allems, Dr. Hoenig and Dr. Polanco were incomplete or flawed, as discussed above, Aetna Defendants acted arbitrarily in nevertheless crediting those opinions while simultaneously failing to credit the contrary reliable opinions of Plaintiff's treating physicians that Plaintiff's fibromyalgia accounted for his chronic pain and rendered him unable to work. *See James*, 41 F. Supp. 3d at 874-75.

**Neurological conditions.** In support of his claim, Plaintiff submitted evidence showing that Dr. David L. Kaufman, a complex disease specialist, diagnosed him in 2017 with small fiber neuropathy and autoimmune peripheral neuropathy and noted that he "believe[d] this autoimmune disease is the cause of his misery." AR1924. In May 2018, Dr. Kaufman further opined that Plaintiff was "totally disabled" and could not engage in any full-time or part-time work because he was unable to stand, walk, type, or read as a result of autoimmune autonomic neuropathy and inflammatory polyneuropathy, which causes "progressive neurologic symptoms and a chronic refractory pain syndrome." AR1219-20. Dr. Kaufmann described in detail the various tests and laboratory findings that supported his diagnoses, which included an abnormal EMG, an abnormal PET scan, a finding of small fiber neuropathy in a skin biopsy, and other positive test results for various antibodies and proteins. AR1219.

45

1    In terminating Plaintiff's LTD benefits and in upholding the termination, Aetna

2    Defendants failed to credit Dr. Kaufman's opinions without citing to reliable evidence that

3    supported their contrary determination that Plaintiff was *not* disabled because of a neurological

4    condition.  The only medical opinions that Aetna Defendants relied upon in the March 2020 final

5    denial letter to support their conclusion that Plaintiff was not disabled because of a physical

6    condition were Dr. Allems' IME report and the opinions of Dr. Hoenig and Dr. Polanco.  For the

7    reasons below, the opinions of Dr. Allems, Dr. Hoenig, and Dr. Polanco regarding Plaintiff's

8    neurological conditions were unsupported and conclusory.

9    Dr. Allems opined that Plaintiff was not disabled because of hereditary or idiopathic

10   neuropathy or chronic inflammatory demyelinating polyneuritis.  AR2901.  The basis for that

11   conclusion is not made clear in Dr. Allems' report.  Dr. Allems did not discuss Dr. Kaufman's

12   diagnoses and opinions that Plaintiff was totally disabled because of autoimmune autonomic

13   neuropathy and inflammatory polyneuropathy.  That, as well as the fact that Dr. Allems noted in

14   his report that Plaintiff had "never been diagnosed with a neurological condition other than ulnar

15   nerve entrapment in 2010 by report," *see* AR2901, indicates that Dr. Allems either did not have

16   access to Dr. Kaufman's diagnoses and opinions (which pre-dated his report), or that he failed to

17   take them into account in assessing whether Plaintiff was disabled from a neurological condition.

18   AR2901.  Dr. Allems' failure to consider Dr. Kaufman's diagnoses and opinions renders his

19   finding that Plaintiff was not disabled because of a neurological condition conclusory.

20   Defendants' reliance on Dr. Allems' report to support their determination that Plaintiff was not

21   disabled because of a neurological condition was, therefore, an abuse of discretion.  *See Whealen*,

22   2007 WL 1891175, at *13.

23   Dr. Hoenig noted in his initial report that Plaintiff had diagnoses of "other hereditary and

24   idiopathic neuropathies" and small fiber neuropathy, and that Plaintiff reported pain across his

25   body that affected his ability to stand, walk, and type.  AR722-23.  In the addendum to his initial

26   report, Dr. Hoenig noted that Plaintiff's complaints of pain were "presented consistently

27   throughout the course of treatment" and were "ongoing."  AR481.  Nevertheless, Dr. Hoenig

28   concluded that Plaintiff was not functionally impaired from a pain medicine perspective from any

United States District Court
Northern District of California

46

United States District Court
Northern District of California

physical condition, including a neurological condition, and that Plaintiff's symptoms and complaints were not "clearly explained by the medical findings." AR481-82. Dr. Hoenig did not discuss Dr. Kaufman's diagnoses and opinions that Plaintiff was disabled because of autoimmune autonomic neuropathy and inflammatory polyneuropathy. Because it appears that Dr. Hoenig, like Dr. Allems, either did not have access to Dr. Kaufman's diagnoses and opinions, or that he failed to take them into account in assessing whether Plaintiff was functionally impaired due to a neurological condition, his report is incomplete and conclusory and Defendants' reliance on it was an abuse of discretion. *See Whealen*, 2007 WL 1891175, at *13.

Dr. Polanco acknowledged that Plaintiff had been diagnosed with peripheral neuropathy, AR709, AR473, and that Plaintiff had "chronic complaints of pain," including "muscle/joint and nerve pain," AR709. In the addendum to his report, Dr. Polanco concluded that "the medical records support the diagnosis of peripheral neuropathy" and that Plaintiff's "complaints are consistent throughout the course of his treatment." AR473-74. Nevertheless, Dr. Polanco concluded that Plaintiff did not have functional impairments caused by any physical condition that precluded him from working full time. AR474-75. Like the other reviewers discussed above, Dr. Polanco did not discuss Dr. Kaufman's diagnoses and opinions that Plaintiff was disabled because of autoimmune autonomic neuropathy and inflammatory polyneuropathy. Because it appears that Dr. Polanco either did not have access to Dr. Kaufman's diagnoses and opinions, or that he failed to take them into account in assessing whether Plaintiff was functionally impaired due to a neurological condition, his report is incomplete and conclusory and Defendants' reliance on it was an abuse of discretion. *See Whealen*, 2007 WL 1891175, at *13.

Because the opinions of Dr. Allems, Dr. Hoenig, and Dr. Polanco were incomplete and flawed, as discussed above, Aetna Defendants acted arbitrarily and capriciously in nevertheless crediting those opinions while simultaneously failing to credit the contrary reliable opinions of Dr. Kaufman that Plaintiff's autoimmune autonomic neuropathy and inflammatory polyneuropathy caused his pain and rendered him unable to work. *See James*, 41 F. Supp. 3d at 874-75.

**Depression as a symptom of fibromyalgia.** Plaintiff submitted evidence in support of his LTD benefits claim that he experienced depression as a symptom of fibromyalgia and that a

1    mental illness was not the cause of his disability.  *See, e.g.*, AR788 (Dr. Congdon, who has treated

2    Plaintiff for fibromyalgia since 2017, opining that depression is a symptom of fibromyalgia and is

3    not a cause of Plaintiff's disability); *see also* AR776 (Dr. Green, who has treated Plaintiff since

4    2011, opining that Plaintiff "has no evidence of psychiatric illness and is not psychiatrically

5    disabled").

6        Aetna Defendants failed to credit that evidence without pointing to contrary reliable

7    evidence that Plaintiff's depression was a separate illness that was causing his disability as

8    opposed to being secondary to fibromyalgia, which is a physical condition whose symptoms

9    include depression and anxiety.  *See Lang v. Long-Term Disability Plan of Sponsor Applied*

10   *Remote Tech., Inc.*, 125 F.3d 794, 796 (9th Cir. 1997) ("The depression and anxiety associated

11   with fibromyalgia are believed to be symptoms of this muscular disease, rather than causes of it.").

12   The issue of whether any depression that Plaintiff may have experienced was a symptom of

13   fibromyalgia as opposed to a separate mental illness is relevant because his LTD benefits were

14   terminated as of June 28, 2019, in part because he failed to submit proof that he was under the

15   "regular care of a physician" for a mental illness.  If Plaintiff's depression was merely a symptom

16   of fibromyalgia as opposed to a separate illness that caused his disability, then the Group Policy

17   terms would not have required Plaintiff to be under the care of a physician for the depression.[23]

18       As discussed above, the only medical evidence that Aetna Defendants cited in the April

19   2019 letter, June 2019 letter, and March 2020 final denial letter that pertains to whether Plaintiff's

20   impairments and disability were caused by a mental illness was Dr. Allems' IME report.  Dr.

21   Allems did not explain how he reached the conclusion that the impairments he found after

22   physically examining Plaintiff, which precluded Plaintiff from sitting, standing, walking, and

23   performing fine manipulation for more than 2.5 hours in a workday, were caused by "severe

---

[23] The Group Policy requires that the claimant be under the "regular care of a physician" for "the *illness*, injury, or pregnancy related condition *that caused the disability*."  AR3182 (emphasis added).  The Group Policy defines "illness" as a "pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to the findings [that] set the condition apart as an abnormal entity differing from other normal or pathological body states." AR3201.  Thus, if Plaintiff experienced depression only as a symptom of fibromyalgia (as opposed to experiencing depression as a separate illness that caused his disability), then he was not required to be under the regular care of a physician for the depression.

United States District Court
Northern District of California

untreated psychopathology masquerading as physical illness, probable conversion disorder and profound depression." AR2983. As discussed above, Dr. Allems did conduct any tests to determine whether Plaintiff suffered from a mental illness, to determine the severity of any such mental illness, or to determine the extent to which any of Plaintiff's impairments were caused by any such mental illness. *See* AR2870-2904. Further, there is no indication in Dr. Allems' IME report that he considered, much less ruled out, the possibility that any symptoms of depression that Plaintiff may have reported experiencing could have been *symptoms* of fibromyalgia, as opposed to being indicative of a separate mental illness that was causing Plaintiff's physical impairments. Dr. Allems' opinions that Plaintiff's physical impairments were caused by "profound" depression and "possible conversion disorder," therefore, lacked adequate support. Defendants' reliance on those opinions to terminate Plaintiff's LTD benefits on the ground that Plaintiff was required, but failed, to submit proof that he was under the care of a psychiatrist under the "regular care of a physician" provision, while simultaneously failing to credit Plaintiff's reliable evidence that his disability was *not* caused by a mental illness and that his depression was a symptom of fibromyalgia, was arbitrary and capricious. *See James*, 41 F. Supp. 3d at 874-75.

### iii.   Emphasis on reports that supported terminating LTD benefits

A district court may find that a termination of benefits was an abuse of discretion if the plan administrator "emphasized a certain medical report that favored a denial of benefits, [and] had deemphasized certain other reports that suggested a contrary conclusion[.]" *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008) (citation omitted).

As discussed above, in their final denial letter of March 2020, Aetna Defendants relied on the reports of Dr. Hoenig and Dr. Polanco, who opined that Plaintiff does not have functional limitations that prevent him from working full time, to support their determination that Plaintiff was not disabled from any reasonable occupation. Those reports may have been improperly biased in favor of finding that Plaintiff was not disabled because Aetna Defendants shared with Dr. Hoenig and Dr. Polanco the reports of other peer reviewers who concluded that Plaintiff was not disabled (Dr. Crossley, Dr. Sims, and Dr. Ash) but did not share the report of peer reviewer

1    Dr. Stauber, who concluded that Plaintiff was incapable of working full-time.  Aetna Defendants

2    thus emphasized reports that favored a denial of benefits and deemphasized reports that supported

3    the opposite conclusion.  That supports a finding that Defendants abused their discretion.  *See*

4    *Glenn*, 554 U.S. at 118.

5           Another example of the same type of arbitrary and capricious conduct is the following.

6    Aetna Defendants credited in the March 2020 final denial letter Dr. Polanco's opinions that

7    Plaintiff could work full time even though his opinions were based only on a review of Plaintiff's

8    medical records and conflicted with Dr. Allems' more restrictive functional findings.  As

9    discussed above, Dr. Allems opined that Plaintiff could not sit, stand, walk, or perform fine

10   manipulation for more than 2.5 hours in an eight-hour workday, and Plaintiff did not appeal or

11   otherwise challenge those findings.  Defendants have not explained why Aetna Defendants

12   credited Dr. Polanco's opinions that Plaintiff did not have functional limitations that precluded

13   him from working full-time rather than crediting those of Dr. Allems, which were based on an in-

14   person examination rather than a mere paper review and were not challenged by Plaintiff.  Aetna

15   Defendants' reliance on Dr. Polanco's opinions regarding Plaintiff's functional limitations and

16   capacity to work was, therefore, arbitrary and capricious.  *See Demer v. IBM Corp. LTD Plan*, 835

17   F.3d 893, 906 (9th Cir. 2016) (holding that the plan abused its discretion by crediting a physical

18   functional capacity that was based on a paper review and that "conflicted with the more restrictive

19   assessment" by another physician).

20                          **iv.      Lack of meaningful dialogue**

21           ERISA requires a meaningful dialogue between the administrator and the beneficiary.  *See*

22   *Saffon*, 522 F.3d at 870.  In resolving a claim for benefits, an administrator is required to provide

23   the claimant "[a] description of any additional material or information" that was "necessary" for

24   him to "perfect the claim," and to do so "in a manner calculated to be understood by the claimant"

25   while the claimant still has an opportunity to present the evidence during the administrative

26   process.  *See id.* (quoting 29 C.F.R. § 2560.503-1(g)).  A failure to engage in meaningful dialogue

27   with a claimant "represents an abuse of discretion."  *Quezada v. Lincoln Life Assurance Co. of*

28   *Bos.*, No. C 20-07515 WHA, 2021 WL 4079161, at *9 (N.D. Cal. Sept. 8, 2021).

United States District Court
Northern District of California

Aetna Defendants failed to comply with these requirements.  The March 2020 final denial letter, which resolved Plaintiff's administrative appeal, states that Plaintiff "did not meet definition of disability, as defined by the Plan, from an illness or injury that would have prevented [him] from performing any reasonable occupation *due to lack of medical evidence* to support a physical impairment." AR3043.  However, in their letters of April 2019 and June 2019, Aetna Defendants did not provide Plaintiff with a description of additional information he could have submitted during the administrative process to perfect his claim for LTD benefits based on a physical condition, nor did they explain why the information Plaintiff had already submitted was insufficient.[24]  *See* AR2917.  This failure not only conflicts with the requirements of ERISA, but also with Aetna Defendants' own guidelines for processing claims, which permit them to terminate a claim for benefits if they request information from the claimant that they need to determine ongoing disability, the claimant "is aware of what information is needed," and the claimant fails to submit he information "after at least two (2) follow ups." *See* AR2918.  This further supports a finding that Defendants abused their discretion.

### v.    Failure to distinguish Social Security award of benefits

Social security awards are "evidence of disability." *Salomaa*, 642 F.3d at 679.  A failure to sufficiently address a social security award in a denial or termination letter "offers support that the plan administrator's denial was arbitrary, an abuse of discretion." *See id*.

On July 31, 2019, the SSA awarded Plaintiff disability benefits on the basis that Plaintiff had been disabled since October 5, 2016, based, in relevant part, on some of the physical

---

[24] The June 2019 letter invited Plaintiff to submit any additional information he "care[d] to submit," and provided general examples of such information.  That was not sufficient to inform Plaintiff of what information he needed to submit to perfect his claim, because the letter did not explain why the information Plaintiff had submitted as of the date of the letter was inadequate. *See Saffon*, 522 F.3d at 870 (finding that defendant failed to inform the plaintiff of information he could submit to perfect her claim because the denial letter stated that the claimant could submit additional "objective medical information to support [her] inability to perform the duties of [her] occupation," but it did not explain why the information the claimant "ha[d] already provided is insufficient for that purpose"); *see also Kurth v. Hartford Life & Acc. Ins. Co*., 845 F. Supp. 2d 1087, 1101 (C.D. Cal. 2012) (holding that plan administrator abused its discretion in relevant part because it failed "to explain adequately why Dr. Patadia's diagnosis was sufficient for it to grant benefits for a time, and yet completely unacceptable once the investigation began").

United States District Court
Northern District of California

1    conditions that form the basis of his LTD benefits claim under the Group Policy, namely Lyme

2    disease, fibromyalgia, and headaches.  *See* AR876.  The SSA credited Plaintiff's testimony that

3    those conditions cause him daily pain throughout his body, headaches, and numbness in his hands,

4    feet, and head, among other symptoms.  AR871. The SSA found that "the medical evidence

5    corroborates the opinions that the claimant suffers from severe pain and fatigue secondary to

6    fibromyalgia and Lyme disease, which are reasonably found to significantly limit his ability to

7    persist over the course of an 8-hour workday, and work week."  AR875.  The SSA concluded that

8    Plaintiff was unable to perform past relevant work because of his functional limitations, and that

9    there were no jobs in the national economy that he could perform given his limitations.  AR875-76.

10       In the March 2020 final denial letter resolving Plaintiff's appeal, Aetna Defendants briefly

11   discussed the SSA's decision of July 2019; this is the extent of that discussion:

> We were provided with the basis for SSD determination within the
> Administrative Law Judge (ALJ) notice of decision dated July 31,
> 2019.  While your client was awarded Social Security Disability
> (SSD) and considered disabled under their rules, please be aware
> our disability determination and the SSD determination are made
> independently and not always the same.  Our review and
> determination was based on a contractual basis.  Based on our
> review of the existing clinical information in your client's claim
> file, the peer reviewers' opinions with limitations outlined and
> Employability Analysis Report, we found your client was not
> eligible for LTD benefits based on the LTD plan's definition of
> disability of being unable to perform the material duties of any
> reasonable occupation as defined by the Plan, from June 28, 2019
> to present.

20   AR3046.

21       "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would

22   entail comparing and contrasting not just the definitions employed but also the medical evidence

23   upon which the decisionmakers relied."  *Montour*, 588 F.3d at 637.  The Court finds that Aetna

24   Defendants' discussion of the SSA's determination was cursory and boilerplate and failed to

25   satisfy that standard because it lacked any meaningful "comparing and contrasting" of the medical

26   evidence.[25]  *See id.*; *see also Williams v. Reliance Standard Life Ins. Co.*, 164 F. Supp. 3d 1230,

27

28   _____
     [25] Defendants argue in their briefs that the SSA's decision is distinguishable because the SSA
     "relied heavily on the opinions of treating doctors David Kaufman, MD, Melissa Congdon, MD

United States District Court
Northern District of California

1   1254 (D. Or. 2016) ("The initial termination-of-benefits letter from December 2013 contained

2   boilerplate language acknowledging the favorable social security determination but without an

3   individualized assessment of the decision.  Defendant simply stated that the entitlement to social

4   security 'may' be based on different guidelines and that each benefit provider 'may' consider

5   different medical evidence. . . . This is insufficient to satisfy Defendant's obligation to thoroughly

6   assess Plaintiff's claim.").

7        Defendants argue that Aetna Defendants did not have the ability to distinguish the SSA's

8   determination beyond what they wrote in the March 2020 final denial letter because they did not

9   have access to Plaintiff's social security file.  *See* ECF No. 76 at 16.  The Court is not persuaded.

10   For one, the record shows that Aetna Defendants obtained authorization to request Plaintiff's

11   social security file directly from the SSA.  *See* AR147.  That suggests that Aetna Defendants could

12   have obtained the file if they wished to do so.  Second, to the extent that Aetna Defendants

13   believed that they needed, but lacked, Plaintiff's social security file to properly distinguish the

14   SSA's decision in the March 2020 final denial letter, they were required to notify Plaintiff of the

15   deficiency and provide him with an opportunity to rectify it *before* they issued the March 2020

16   final denial letter.  *See Saffon*, 522 F.3d at 871 ("Insofar as [Hartford] believed that" additional

17   documentation establishing the reasoning and evidence underlying the SSA's disability

18   determination "was necessary for it to evaluate [the plaintiff's] claim," it should have said so "at a

19   time when [the plaintiff] had a fair chance to present evidence on this point.").  Defendants have

20   not pointed to any evidence in the record showing that they did so.

21        The foregoing further supports a finding that Defendants abused their discretion.

22   **vi.    Conclusion with respect to abuse of discretion analysis**

23        Taking into account the totality of the circumstances, and while reviewing the record with

24   a moderate degree of skepticism in light of Aetna Defendants' structural conflict of interest, the

25   Court finds that Aetna Defendants abused their discretion in terminating Plaintiff's LTD benefits

26   _____

27   and Christine Green, MD," whereas Aetna Defendants were not required to accord special weight
   to the opinions of Plaintiff's treating doctors.  *See* ECF No. 75 at 20.  That basis for distinguishing

28   the SSA's determination is irrelevant to the resolution of the present motions because it was not
   included in any of Defendants' denial letters.

as of June 28, 2019.  In the absence of Aetna Defendants' arbitrary and capricious conduct, Plaintiff would have continued to receive LTD benefits on the ground that he was disabled from any reasonable occupation because of a physical condition (e.g., fibromyalgia, autoimmune autonomic neuropathy, and inflammatory polyneuropathy) based on the evidence that Plaintiff submitted in support of his claim but that Defendants failed to credit, as discussed above; and because the record does not contain any reliable evidence that Plaintiff's functional limitations or pain levels had improved between April 2019, when Defendants determined that Plaintiff was totally disabled from any reasonable occupation based on the restrictions and limitations Dr. Allems found after conducting a physical ability assessment of Plaintiff, which Plaintiff did not appeal, and March 2020, when Defendants denied Plaintiff's appeal of the second termination of his LTD benefits.[26]  *See Saffon*, 522 F.3d at 871 ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled.  In order to find her no longer disabled, one would expect the [medical evidence] to show an improvement").

### 3.    Remedy

Ordinarily, "if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions."[27]  *Pannebecker v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1213, 1221 (9th Cir. 2008) (citation omitted).  Stated differently, where the termination of benefits is the result of the plan administrator's abuse of discretion, "retroactive reinstatement of benefits is

---

[26] The only medical evidence discussed in the March 2020 final denial letter that supported a finding that Plaintiff was not disabled and could work full-time between June 2019 and March 2020 consisted of the reports of Dr. Hoenig and Dr. Polanco.  For the reasons discussed above, the opinions in those reports are unsupported and flawed and it was an abuse of discretion for Aetna Defendants to rely on them to conclude that Plaintiff was not disabled.  The March 2020 final denial letter also mentioned the 2020 Employability Analysis Report to support Aetna Defendants' determination that Plaintiff "no longer meets the policy definition of Disability" due to a physical condition, but that report relied on Dr. Polanco's opinion that Plaintiff was capable of working full-time with some restrictions.  Given that the employability analysis was premised on Dr. Polanco's opinions, it is also flawed and unreliable for the purpose of establishing Plaintiff's ability to work.

[27] This is in contrast to situations where a claimant's initial application for benefits was denied; in that circumstance, the claimant is entitled to a different remedy, namely "remand to the administrator to apply the terms [of the policy] correctly in the first instance."  *See Pannebecker*, 542 F.3d at 1221.

1   appropriate[.]" *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001).

2   "[A] plan administrator will not get a second bite at the apple when its first decision was simply

3   contrary to the facts." *Id.*

4       In this case, however, the parties have not briefed the question of remedy, and the Court

5   hesitates to impose one without first hearing from the parties.  Accordingly, the parties are ordered

6   to meet and confer regarding an appropriate remedy and submit either a stipulation, or a joint brief

7   of not longer than 10 pages setting forth their respective positions, by September 6, 2024.

8       **B.      Claim for Penalties under Section 502(c)(1)**

9           **1.      Legal Standard**

10      Summary judgment is proper when a "movant shows that there is no genuine dispute as to

11  any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

12  Where the party moving for summary judgment would bear the burden of proof at trial, that party

13  "has the initial burden of establishing the absence of a genuine issue of fact on each issue material

14  to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.

15  2000).  Where the party moving for summary judgment would not bear the burden of proof at trial,

16  that party "must either produce evidence negating an essential element of the nonmoving party's

17  claim or defense or show that the nonmoving party does not have enough evidence of an essential

18  element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz*

19  *Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party satisfies its initial burden of

20  production, the nonmoving party must produce admissible evidence to show that a genuine issue

21  of material fact exists.  *Id.* at 1102-03.  If the nonmoving party fails to make this showing, the

22  moving party is entitled to summary judgment.

23          **2.      Analysis**

24      Under ERISA 502(c)(1), 29 U.S.C. § 1132(c)(1), "a plan administrator who 'fails or

25  refuses to comply with a request for any information which such administrator is required by this

26  subchapter to furnish . . . within 30 days after such request may in the court's discretion be

27  personally liable to such participant or beneficiary in the amount of up to $100 a day from the date

28  of such failure or refusal." *Lee v. ING Groep, N.V.*, 829 F.3d 1158, 1160 (9th Cir. 2016) (quoting

29 U.S.C. § 1132(c)(1)).  When resolving a motion for summary judgment with respect to a claim for penalties under Section 502(c)(1), the court must determine "whether, viewing the evidence in the light most favorable to the non-moving party, any genuine issue of material fact exists" as to whether the plaintiff requested information from the plan administrator and whether the plan administrator produced the information within 30 days of the request.  *See id.*

In the operative complaint, Plaintiff asserts a claim for penalties for non-disclosure of plan documents and information under ERISA 502(c)(1), 29 U.S.C. § 1132(c)(1), against the plan administrator, Aetna Defendants.  *See* ECF No. 53 ¶¶ 38-41.

Defendants move for summary judgment with respect to this claim on the ground that there is no evidence that Aetna Defendants failed to respond to Plaintiff's requests for documents and information.

Plaintiff did not respond Defendants' motion for summary judgment with respect to this claim or point to any evidence showing that Aetna Defendants failed to comply with any request for information under 29 U.S.C. § 1132(c)(1).  *See generally* ECF Nos. 63, 65, 74, 77.

Because Plaintiff, as the party who bears the burden of proof on his claim for penalties, failed to point to any evidence showing that a genuine issue of material fact exists as to whether Aetna Defendants failed to comply with a request for information under 29 U.S.C. § 1132(c)(1), Aetna Defendants are entitled to summary judgment on Plaintiff's claim for penalties under 29 U.S.C. § 1132(c)(1).  The Court, therefore, grants Defendants' motion for summary judgment as to this claim.

## V.    CONCLUSION

For the foregoing reasons:

(1)    The Court GRANTS Plaintiff's motion for judgment on his claim for benefits and DENIES Defendants' cross-motion for judgment with respect to the same.

(2)    The Court GRANTS Defendants' motion for summary judgment with respect to Plaintiff's claim for penalties.

As noted above, the parties are ordered to meet and confer regarding an appropriate remedy and submit either a stipulation, or a joint brief of not longer than 10 pages setting forth

United States District Court
Northern District of California

their respective positions, by September 6, 2024.  If the parties submit a stipulation regarding an appropriate remedy, the parties also shall submit a stipulated judgment.

**IT IS SO ORDERED.**

Dated:  August 8, 2024



_____
JON S. TIGAR
United States District Judge